**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: DAVID C. MARCHESE | : CHAPTER 7 |
| Debtor | : CASE NO. 16-13810-ELF |
| | |
| DAVID C. MARCHESE | : |
| 3 Embassy Circle | : ADVERSARY NO: 17-00189-elf |
| Norristown, PA 19403 | : |
| Plaintiff | : |
| v. | : |
| JAMES MCCAULEY t/a MCCAULEY | : |
| ASSOCIATES LIMITED PARTNERSHIP | : |
| 1 Center Avenue | : |
| Collegeville, PA 19426 | : |
| and | : |
| GERALD MULLANEY | |
| 3881 Skippack Pike | : |
| Skippack, PA 19474 | : |
| and | : |
| HOPWOOD FARM, LLC | : |
| 3881 Skippack Pike | : |
| Skippack, PA 19473 | : |
| Defendants | : |

## AMENDED COMPLAINT

The Chapter 7 United States Trustee, Gary Seitz, through his undersigned

counsel, files the within Amended Complaint, and in support thereof, avers as follows:

## I.    PARTIES AND JURISDICTION

1.    Plaintiff, David C. Marchese, is an adult individual and member of

Hopwood Farms, LLC.  On May 26, 2017, David C. Marchese filed for protection under

Chapter 7 of the United States Bankruptcy Code.  David C. Marchese's interest in

Hopwood Farms, LLC is now property of his Bankruptcy Estate.

2.    Plaintiff, Gary Seitz, Chapter 7 United States Trustee. Plaintiff was

appointed as Trustee of the David C. Marchese's Bankruptcy estate and is duly qualified

and presently acting as Trustee.

3.      The Defendant is James McCauley, individually and t/a McCauley

Associates Limited Partnership ("McCauley"). McCauley is an adult individual with an

address at 1 Center Avenue, Collegeville, PA 19462.

4.      Upon information and belief, McCauley is the general partner of

McCauley Associates Limited Partnership, an entity that is believed to be a Pennsylvania

limited partnership with an address at One Center Avenue, Collegeville, PA 19462.

5.      The Defendant is Gerald Mullaney, an adult individual with an address at

3881 Skippack Pike, Skippack, PA 19474.  Mr. Mullaney is a member of Hopwood

Farms, LLC and at all times relevant to this action acted as the managing member of the

LLC pursuant to the Operating Agreement signed by all the members.  Mr. Mullaney is a

member of the Bar of the Commonwealth of Pennsylvania.

4.      Nominal defendant is Hopwood Farm, LLC, a Pennsylvania Limited

Liability Company with an address at 3881 Skippack Pike, Skippack, PA 19474

("Hopwood").

5.      The Trustee asserts both direct and derivative claims. To the extent that

the Trustee asserts derivative claims on Hopwood's behalf, the Trustee has authority to

sue on behalf of Hopwood's behalf because Marchese is a majority owner of the LLC.

5.      The Bankruptcy Court has jurisdiction over this Adversary Proceeding

pursuant to 28 U.S.C. §1334.

6.      This Adversary Proceeding is a "core" proceeding pursuant to 28 U.S.C. §

157(b).

7.      Venue of this Adversary Proceeding in this Court is proper pursuant to 28

U.S.C. § 1409(a).

## II.    BACKGROUND

### A.    <u>FORMATION OF HOPWOOD FARMS</u>

8.      On or about October 27, 2005, a Certificate of Formation was filed with
the Pennsylvania Department of State for the formation of Hopwood.  The registered
address of Hopwood was 3881 Skippack Pike, Skippack, PA, 19474, which is the law
firm address of attorneys Gerald Mullaney and his brother Martin Mullaney (collectively,
the "Mullaneys").

9.      On or about November 18, 2005, the Mullaneys, along with McCauley,
Paul Newlin ("Newlin") and the debtor, David Marchese ("Marchese") executed a
Limited Liability Operating Agreement for the operation of Hopwood ("Operating
Agreement). See **Exhibit "A".**

10.     According to the Operating Agreement, Marchese had a 50% interest in
Hopwood and each of the other members each had membership interests in the following
percentages: McCauley 12.5%, the Mullaneys 25%, and Newlin 12.5%.

11.     The business purpose of Hopwood was to acquire property at 172
Hopwood Road for the principal purpose of subdividing and developing the property into
12 single-family homes ("Hopwood Property").

12.     Gerald Mullaney was appointed Managing Member pursuant to Article
10.2 of the Operating Agreement

13.     After execution of the Operating Agreement, on or about December 15,
2005, Gerald Mullaney executed a Note and Mortgage as Managing Member of
Hopwood in the principal amount of $1,235,000 in favor of Harleysville National Bank

(the "Harleysville Loan"), in order to secure financing for the purchase of the Hopwood

Property.

14.      Upon information and belief, the Mullaneys each executed personal

guarantees for the Harleysville Loan.

15.      Hopwood purchased the Hopwood Property from the Hopwood Farm

Family Trust for $1,900,000.

16.      According to the 2007 Form K-1 for Hopwood, Marchese contributed

$691,000 as an initial capital contribution, and McCauley contributed $182,895.65.  No

other member of Hopwood made any capital contributions.

17.      It is believed that the $691,000.00 that David C. Marchese contributed to

the Hopwood Farms, LLC enterprise was taken directly from the Estate of Joseph D.

Marchese as an improper at risk distribution of property that was ultimately determined

by the Montgomery County Court of Common Pleas, Orphans' Court Division (hereafter

"Orphans' Court") to belong to the Estate of Joseph C. Marchese.

18.      Marchese's capital contribution was used to fund the purchase price of the

Hopwood Property.

19.      Upon information and belief, Marchese made all of the mortgage

payments on the Harleysville Loan.

20.      Marchese also paid all of the engineering and related costs for developing

the Hopwood Property.

        **B.**        **THE ORPHANS' COURT LITIGATION**

21.      As early as 2010, Marchese, as executor of the Joseph D. Marchese Estate,

was embroiled in litigation in the Orphans' Court brought by the Estate of Joseph C.

Marchese, Deceased, O.C. No. 1998-X3148,

22.     On March 21, 2012, the Hon. Lois E. Murphy of the Orphans' Court

entered an Order (the "March 2012 Order") in favor of the Estate of Joseph C. Marchese

and against the Estate of Joseph D. Marchese, and determined that $1,412,935 had

wrongfully been diverted by the Estate of Joseph D. Marchese from the beneficiaries of

the Joseph C. Marchese estate (the "Diverted Accounts").

23.     Judge Murphy's Order required Marchese personally to return the

Diverted Accounts to the Estate of Joseph C. Marchese.

24.     The March 2012 Order was appealed by Marchese to the Pennsylvania

Superior Court.  By Order dated June 24, 2014, the Pennsylvania Superior Court

dismissed the appeal.

25.     By Order dated July 18, 2014, Judge Murphy Ordered Marchese to refund

to the Estate of Joseph C. Marchese all of the Diverted Accounts plus interest from 1998

within 30 days.

26.     Marchese, however, failed to comply with any of Judge Murphy's Orders.

On September 5, 2012, Judge Murphy found Marchese in contempt for not returning the

Diverted Accounts.

27.     Judge Murphy then removed Marchese as personal representative of the

Estate of Joseph D. Marchese and appointed Gregory W. Philips, Esquire, as

Administrator D.B.N.C.T.A. in his stead on September 21, 2012.

28.     On November 5, 2014, Judge Murphy entered judgment against Marchese

in the amount of $1,766,318.34, plus interest at 6% per annum beginning in 1998.

29.     In the Orphans' Court contempt proceedings, Marchese testified that he

used the proceeds of the Diverted Accounts to provide initial capital contributions to fund various businesses, including Hopwood.

### C.  THE CONSTRUCTIVE TRUST

30.    Marchese and his mother Marie Marchese were both subsequently sanctioned by the Orphans' Court for not returning the Diverted Accounts.

31.    On January 25, 2013, Mr. Philips filed a Petition to Impose a Constructive Trust over all of Marchese's assets, including his business interests that specifically included Hopwood.

32.    Mr. Philips sent Gerald Mullaney a copy of the Petition and placed Mullaney and Hopwood on notice that Mullaney, or any member of Hopwood, was not to sell or otherwise dispose of Marchese's interests in Hopwood.

33.    On January 25, 2015, Judge Murphy imposed a constructive trust over Marchese's assets, including his mother Marie ("Constructive Trust Order").

34.    Judge Murphy's Constructive Trust Order specifically stated that it included **all of David Marchese's business interests, including Hopwood** (emphasis added).

35.    Mr. Philips again notified Gerald Mullaney of the Order.

36.    Further, Judge Murphy entered an Order and Opinion that specifically stated that the effective date of the constructive trust imposed over Marchese's assets was April 24, 2009.

37.    In order to purge his contempt after being incarcerated by Judge Murphy, on January 28, 2015, Marchese executed an assignment of all of his interests in Hopwood to the Estate of Joseph D. Marchese.

6

38.     Mr. Philips notified Gerald Mullaney of the assignment. Mullaney

testified at his deposition that he was aware of the Constructive Trust Order:

```
BY MR. BIRCH:

    Q.    Were you aware that Judge Murphy of the Orphans'

Court had issued a constructive trust over all of David's

assets?

    A.    I became aware of that.

          MR. SABA:  Objection to form.  Go ahead.

          THE WITNESS:  I became aware of it.

BY MR. BIRCH:

    Q.    Okay.  How did you become aware of that?

    A.    I think through an email.

***
```

Testimony of Gerald Mullaney, June 12, 2017.

39.     The Court of Common Pleas subsequently entered judgment on August

29, 2016, against Hopwood Farms, LLC, in the amount of $1,766, 318.34.

**D.      THE SCHEME**

40.     Sometime in 2011, the Mullaneys and McCauley agreed to a scheme

whereby the Mullaneys would be relieved of their personal debt and  transfer their

membership interest in Hopwood, and McCauley would end up with full ownership of

the Hopwood Property.

41.     Upon information and belief, Marchese was not aware of the above "side-

deal" between the Mullaneys and McCauley.

42.      Marchese's consent was not obtained.

43.     The Mullaneys accordingly transferred all of their membership interests in

Hopwood to McCauley despite the restrictions in Article 7 of the Operating Agreement.

The consent for the transfer of the membership interests was not executed by Marchese and was therefore in violation of the Operating Agreement.

44.    After the Mullaneys' membership interests were transferred to McCauley, Gerald Mullaney remained as Managing Member.

45.    After acquiring the Mullaneys' membership interests for no consideration, McCauley then entered into private negotiations with the mortgage lender, to the exclusion of Marchese, and purchased the Promissory Note for approximately $500,000.

46.    McCauley, however, informed Marchese that McCauley was negotiating on behalf of all the members.

47.    After McCauley conducted his private negotiations with the bank to acquire the Note, McCauley then refused to communicate with Marchese.

48.    In furtherance of this scheme, on September 6, 2012, McCauley then filed a Complaint in Mortgage Foreclosure in the Montgomery County Court of Common Pleas.

49.    Service of the Foreclosure Complaint was accepted by Gerald Mullaney.

50.    However, despite Gerald Mullaney receiving express notice of the Constructive Trust Order from the Administrator of the Joseph C. Marchese Estate, Greg Philips, Mullaney intentionally failed to inform the members of Hopwood of either the Constructive Trust Order or the Foreclosure Complaint.

51.    In furtherance of his scheme with McCauley, Gerald Mullaney never defended the Foreclosure Complaint.

52.    On June 15, 2014, McCauley filed a Motion for Summary Judgment.

53.    Because no Answer was filed to either the Foreclosure Complaint or

McCauley's Summary Judgment Motion, the Court entered an Order in favor of McCauley.

54.     However, neither McCauley nor Gerald Mullaney informed the Court that the Constructive Trust Order had already been entered against all of Marchese's interests in Hopwood.

55.      On April 26, 2015, McCauley caused the property owned by Hopwood to be sold at sheriff's sale to McCauley.

56.     Notice of the sheriff sale was never sent to Greg Philips despite his equity ownership of Marchese's capital interest in Hopwood pursuant to Judge Murphy's Order and despite Gerald Mullaney's specific knowledge of the assignment of Marchese's interests in Hopwood.

57.     In addition to the defective sheriff sale, McCauley's actions interfered with Orders of the Court.  McCauley had no legal right or ability to eliminate Marchese's management interest in Hopwood and convert Marchese's equity in Hopwood.

58.     The Constructive Trust Order and the Order for Marchese to assign all of his interests to Mr. Philips clearly predated the sheriff's sale.  McCauley and Mullaney simply ignored those Orders and proceeded with the foreclosure.

59.     After the sheriff's sale, and as part of their scheme, McCauley sent Gerald Mullaney a letter that stated that he would not pursue a deficiency judgment against Hopwood, to the detriment of Marchese who lost his entire interest in Hopwood by the contrived deal between Gerald Mullaney and McCauley.

60.     As part of his scheme, McCauley ended up with a $2,000,000 property in Hopwood with valuable development rights.

61.    As part of his scheme, McCauley ended up with Marchese's entire capital contribution of at least $691,000.

62.    Prior to the default judgment being entered in favor of McCauley, Marchese filed a Complaint against Hopwood and McCauley on November 5, 2012, for breach of fiduciary duties, breach of good faith and fair dealing, breach under 15 Pa. C.S.A. §8321(c)(3), and breach of the operating agreement.

63.    Marchese failed to disclose the action against McCauley and Hopwood on his bankruptcy schedules.

64.    On February 8, 2017, this Court denied Marchese a Chapter 7 discharge.

65.    Moreover, Judge Frank approved a Stipulation on June 28, 2017, between the Trustee and the Estate of Joseph D. Marchese to include any assets recovered from this litigation.

## COUNT I
## BREACH OF THE OPERATING AGREEMENT

66.    The Plaintiff incorporates the above paragraphs as though set forth fully herein.

67.    Hopwood is a closely held corporation.

68.    The Operating Agreement is a contract between the members.

69.    McCauley assumed managerial duties of Hopwood by virtue of his private side-deal with Mullaney wherein Mullaney allowed McCauley to act in his stead.

70.    Pursuant to Article 5.7, McCauley was required to provide all the members with notice of additional funds related to the Note and Mortgage.  McCauley failed and/or refused to do so.

71.    McCauley was also required to attempt, on Hopwood's behalf, to raise

10

needed funding from third parties in order to either satisfy Hopwood's Note and Mortgage

obligations or to purchase the Note and Mortgage on the company's behalf. McCauley

failed and/ or refused to do so.

72.      In the event that McCauley could not raise what the Operating Agreement

defined as "Necessary Funds," he was required to raise such funds from the Members by

sending written notice of a capital call to all Members indicating the total amount of capital

needed. McCauley failed and/or refused to do so.

73.      McCauley's failure to effectuate the procedures mandated by Article 5.7 of

the Operating Agreement constituted a breach of the Operating Agreement.

74.      McCauley's breach of the Operating Agreement directly and proximately

caused Marchese damages in the form of loss of his valuable managerial rights I

Hopwood as well as the opportunity to purchase the Note and Mortgage, the necessity of

defending the Foreclosure Proceedings, and the conversion of the Hopwood Property.

75.      Upon information and belief, McCauley's entire course of conduct, from

the side-deal with Mullaney to the acquisition of the Note for himself, intended to deprive

Marchese of the benefit of his ownership and management rights in Hopwood.

WHEREFORE, Gary Seitz, the Chapter 7 Trustee, demands judgment against

Gerald Mullaney and James McCauley, jointly and severally, for compensatory damages,

punitive damages, attorney's fees and costs of suit.

## COUNT II
## BREACH OF FIDUCIARY DUTY AND THE DUTY OF LOYALTY

76.      The Plaintiff incorporates the above paragraphs as though set forth fully

herein.

77.      McCauley, by assuming all day-to-day managerial responsibilities for

Hopwood, including, but not limited to, negotiating resolution of issues related to the Note

and Mortgage, acted at all relevant times as Hopwood's Manager, or *de facto* manager.

78.     Mullaney was the actual appointed Manager of Hopwood according to the

Operating Agreement, but at some point ceded that authority to McCauley so that McCauley

could effectuate his plan to obtain the Hopwood Property for his own personal use and

benefit.

79.     Mullaney's transfer of his ownership interest to McCauley and McCauley's

purchase of the Note and Mortgage were direct violations of the Operating Agreement, and

their fiduciary obligations to Hopwood and its members.  Moreover, the transfer of the

shares was a violation of 15 Pa. C.S.A 8847(c)(3), which provides in pertinent part:

> **(c)  Manager-managed company.--**In a manager-managed limited
> liability company, the following rules apply:
>
> The affirmative vote or consent of all members is required:
>
> (i)  except as provided under section 325 with respect to a transaction
>      under Chapter 3, to undertake any act outside the ordinary course
>      of the company's activities and affairs;
>
> (ii)  except as provided under section 8822(d), to amend the certificate of
>       organization; or
>
> (iii)  to amend the operating agreement.
>
> ***

80.     Further, 15 Pa. C.S. A. §8849.2 provides that the manager of a limited

liability company, as here Mullaney, shall owe a fiduciary duty of loyalty as follows:

> **(b)  Duty of loyalty.--**The fiduciary duty of loyalty of a manager in a manager-
> managed limited liability company includes the duties:
>
> (1)  to account to the company and to hold as trustee for it any property, profit or
> benefit derived by the manager:

    (i)  in the conduct or winding up of the company's activities and affairs;

    (ii)  from a use by the manager of the company's property; or

    (iii)  from the appropriation of a company opportunity;

(2)  to refrain from dealing with the company in the conduct or winding up of the company's activities and affairs as or on behalf of a person having an interest adverse to the company; and

(3)  to refrain from competing with the company in the conduct of the company's activities and affairs until completion of the winding up of the company.

    ***

81.    McCauley and Mullaney breached their fiduciary duties to Hopwood and to Marchese by their schemes to relieve the Mullaneys of their personal debt obligations, by failing to provide the Members with information related to McCauley's purchase of the Note and Mortgage from American, by initially misrepresenting to the Members that McCauley would negotiate with American to purchase the Note and Mortgage on Hopwood's behalf, by usurping from Hopwood the opportunity to purchase the Mortgage, by ceasing communications with the Members for long stretches of time and by leveraging Hopwood's ownership interest in the Mortgage against Hopwood with an eye towards destroying the company and obtaining title to the Hopwood Property for himself.

82.    McCauley further breached his fiduciary obligation by failing to immediately disclose his obvious conflicts of interest as acting Manager of Hopwood and owner of the Mortgage, by initiating the Foreclosure Proceedings, by failing to advise all Members of the same and by refusing to deal with Hopwood or its Members in good faith from the time he entered into negotiations to purchase the Mortgage from American through his instituting the Foreclosure Proceedings.

83.    The Foreclosure Proceedings were a sham as McCauley had Mullaney

accept service of the foreclosure complaint with knowledge that Mullaney would not seek to defend the foreclosure action on behalf of Hopwood.

84.     As a direct and proximate result of Mullaney's and McCauley's misconduct, Marchese has suffered damages.

85.     The breaches by Mullaney and McCauley caused Marchese, as an individual, unique damages as 50% owner of Hopwood, in that Mullaney and McCauley and set out to destroy said equity interest and steal Marchese's managerial rights in Hopwood and convert the sole asset of Hopwood for his own personal use and benefit.

89.     Upon information and belief, McCauley's entire course of conduct, from the inception of his negotiations with American through his most recent attempts to negotiate with all Members except Marchese, was specifically intended to deprive Marchese of his rights in Hopwood.

WHEREFORE, Gary Seitz, the Chapter 7 Trustee, demands judgment against Gerald Mullaney and James McCauley, jointly and severally, for compensatory damages, punitive damages, attorneys fees and costs of suit.

## COUNT III
## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

90.     The Plaintiff incorporates the above paragraphs as though set forth fully herein.

91.     Mullaney and McCauley were parties to the Operating Agreement.

92.     The Operating Agreement imposed duties upon the Members to refrain from undertaking a course of action designed to secretly destroy Hopwood, stealing its assets for themselves and/or concealing from each other opportunities to resolve issues relating to the Note and Mortgage.

93.     The affirmative duties imposed upon Members, and specifically upon the

Manager, in Article 5.7 of the Operating Agreement, which require additional capital

contributions from Members for, among other reasons, payment of company obligations

pursuant to a note or mortgage, specifically evidence the presence of the foregoing

implied obligations. McCauley breached the foregoing implied covenants by evading the

Operating Agreement and employing a lack of honesty in fact by concealing his plans to

destroy Hopwood and obtain the Hopwood Property for himself.

94.     The foregoing conduct constitutes a breach of the duty of good faith and

fair dealing.

WHEREFORE, Gary Seitz, the Chapter 7 Trustee, demands judgment against

Gerald Mullaney and James McCauley, jointly and severally, for compensatory damages,

punitive damages, attorney's fees and costs of suit

## COUNT IV
## CONSTRUCTIVE TRUST

95.     The Plaintiff incorporates the above paragraphs as though set forth fully

herein.

96.     Pennsylvania imposes a fiduciary obligation upon corporate officers to act

in good faith for the best interest of the corporation they serve.

97.     In Pennsylvania, it is clear that corporate officers may not usurp

opportunities available to the corporation. *Lutherland, Inc. v. Dahlen* (1947), 357 Pa.

143, 151, 53 A.2d 143, 147.

98.     In this regard, it has been held that the availability of a corporate debt for

purchase at a discount constitutes a 'corporate opportunity'. *Weissman v. Weissman, Inc*.

(1953), 374 Pa. 470, 97 A.2d 870.

99.     The fiduciary duty imposed upon corporate officers and directors requires

them to disclose opportunities available to the corporation. Once aware of the opportunity

the corporation may seize or ignore it. If the directors and shareholders, once aware of its

existence, consent to the acquisition of an opportunity by an officer or director, the

opportunity ceases to be corporate and the fiduciary is free to acquire it personally. See

*Weissman v. Weissman, Inc*., *supra*, 374 Pa. at 475, 97 A.2d 870.

100.     Through their "side deal", Mullaney and McCauley conspired to secretly

deal so that McCauley could negotiate for the private purchase of the Note and Mortgage

at a discount and ultimately the ownership of the Hopwood property to McCauley

101.     Neither Mullaney nor McCauley disclosed the side-deal to Marchese,

whereupon Mullaney transferred his membership interests to McCauley so that

McCauley could purchase the Note and Mortgage and ultimately possess the Hopwood

property for himself.

102.     There is no doubt that McCauley's purchase of the Note and Mortgage and

the taking of the Hopwood property at Sheriff's sale was a "corporate opportunity" lost to

the other members, including Hopwood's majority owner, Marchese.

103.     If a corporate officer, in breach of his fiduciary duty, personally acquires

property constituting a corporate opportunity, that property may be subject to a

constructive trust for the benefit of the corporation. *Weissman v. Weissman, Inc*., *supra*;

*Bailey v. Jacobs* (1936), 325 Pa. 187, 194-195, 189 A. 320.

104.     A constructive trust is an equitable remedy intended to be fraud-rectifying.

105.     Since Mullaney and McCauley conspired to destroy Hopwood and the

Hopwood Property is now in the hands of McCauley, the Court must impose a

16

constructive trust over the Hopwood property for the benefit of the members of Hopwood

Farms, LLC and the creditors of the Marchese Bankruptcy Estate

WHEREFORE, Gary Seitz, the Chapter 7 Trustee, requests that this Court impose

a constructive trust over the Hopwood Property and grant such further relief as is just and

proper.

Respectfully submitted:

**/s/ Robert J. Birch**

Dated: December 14, 2017    _____

Robert J. Birch, Esquire

EXHIBIT A

# HOPWOOD FARM, LLC
## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated *Nov. 18th* 2005, relating to Hopwood Farm, LLC (the "Company") is by and among Gerald J. Mullaney, Jr., Martin P. Mullaney, Paul F. Newlin and David C. Marchese and McCauley Associates Partnership and those persons who hereafter join in the Company by executing a Joinder Agreement substantially in the form of Exhibit A hereto (such persons are sometimes referred to individually as a "Member" and collectively as "Members").

## BACKGROUND

The Members have formed the Company for the purpose of owning and managing real property and related activity, as well as for the purpose of carrying on any other lawful business, purpose or activity which a Pennsylvania limited liability company is not prohibited from carrying on. The Members shall own the entire equity interest in the Company at the time of its formation and wish to protect against ownership of an equity interest in the Company by persons who are not willing or able to carry out the intent of the Members in forming the Company. Accordingly, the Members have agreed to restrict transferability of equity interests and provide for certain other matters relating to the Company, all as is more fully described in this Agreement.

NOW THEREFORE, the Company and the Members, in consideration of the foregoing and of the mutual covenants contained herein, and intending to be legally bound hereby, agree as follows:

## ARTICLE 1.
## OFFICES

1.1 Principal Office. The principal office of the Company shall be located at such place as the Members shall designate. The Company may have such other offices as the Members may designate or as the business of the Company may from time to time require.

1.2 Registered Office. The registered office of the Company, required by the Pennsylvania Limited Liability Company Act (the "Statute") to be maintained in the Commonwealth of Pennsylvania, is 3881 Skippack Pike, P.O. Box 1368, Skippack, Pennsylvania, 19474. The registered office may be changed from time to time by action of the Members and by filing the prescribed form with the Pennsylvania Secretary of State.

1.3 Filing of Certificates. The Members have caused a Certificate of Organization to be prepared and filed in accordance with the Statute. The Manager (as hereinafter defined) is authorized to file and record any documents required by or appropriate under the laws of any jurisdiction in which the Company shall carry on its

business or otherwise necessary or appropriate in connection with the preservation of the limited liability of the Members.

## ARTICLE 2.
## MEETINGS

2.1 Annual Meeting. The annual meeting of the Members shall be held on the first Tuesday of March each year, beginning with the year 2006 at the principal office of the Company, or on such other date or at such other place as the Members shall determine, for the purpose of electing Officers (as more fully described in Article 10 herein) and for the transaction of such other business as may come before the meeting. If the day fixed for the annual meeting shall not be a business day, such meeting shall be held on the next succeeding business day. If the election shall not be held on the day designated herein for the annual meeting of the Members, or at any adjournment thereof, the Members shall cause the election to be held at a special meeting of the Members as soon thereafter as it may conveniently be held. The failure of the Company to hold any annual meeting on the designated date shall not in any manner render the acts of the Company invalid, or otherwise adversely affect such acts.

2.2 Regular Meetings. The Members may, by resolution, prescribe the time and place for the holding of regular meetings and may provide that the adoption of any such resolution shall constitute notice of such regular meetings. If the Members do not prescribe the time and place for the holding of regular meetings, such regular meetings shall be held at the time and place specified by the Manager in the notice of each such regular meeting. The Company may, but shall not be required, to conduct regular meetings.

2.3 Special Meetings. Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by the Manager or by any Member. The Company may, but shall not be required to, conduct special meetings.

2.4 Notice of Meeting. Written or telephonic notice stating the place, day and hour of any meeting and, in case of a special meeting, the purposes for which the meeting is called shall be delivered not less than five days before the date of the meeting, either personally or by mail, by or at the direction of the Manager, to each Member of record. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the Member at his address as it appears on the books of the Company, with postage thereon prepaid. When all of the Members of the Company are present at any meeting, or if some, but not all, of the Members are present and those not present sign in writing a waiver of notice of such meeting, or subsequently ratify all the proceedings thereof, the transactions of such meeting are as valid as if a meeting were formally called and notice had been given.

2.5 Quorum. At any meeting of the Members, 51% of the then issued and outstanding Units of LLC Interests (as such terms are hereinafter defined), represented in person or by proxy, shall constitute a quorum at a meeting of the Members. If less than said percentage of the interests are represented at a meeting, a majority of the interests so represented may adjourn the meeting from time to time without further notice. At such reconvened meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified. The Members present at a duly convened meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum.

2.6 Proxies. At all meetings of Members, a Member may vote by proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Such proxy shall be filed with the Manager of the Company before or at the time of the meeting. No proxy shall be valid after three months from the date of execution thereof, unless otherwise provided in the proxy.

2.7 Voting by Certain Members. Any LLC Interest (as defined within Section 4.1 of this Agreement) held in the name of a corporation, partnership or company, may be voted by such officer, partner, agent or proxy as the charter documents of such entity may determine. If a Member dies or a court of competent jurisdiction adjudges him to be incompetent to manage his property, the Member's executor, administrator, guardian or personal representative may exercise all of that Member's rights for the purpose of settling his estate or administering his property.

2.8 Manner of Acting.

(a) Formal Action by Members. Unless otherwise set forth in this Agreement, the affirmative vote of the holders of at least 51% of the then outstanding Units of LLC Interests (the "Required Majority") shall be the act of the Members.

(b) Fifty-One Percent Vote Required. The affirmative vote or consent of Fifty-One Percent of LLC Interests held by the Voting Members shall be required to authorize a manager, Member, or other person to do any act on behalf of the company that contravenes the certificate of organization or a written provision of the operating agreement, including, without limitation, any provision that expressly limits the purpose, business or affairs of the company or the conduct thereof.

(c) Procedure. The Manager of the Company shall preside at meetings of the Members. If the Manager is a Member, he shall have all rights and duties of Members at the meeting, including but not limited to the rights to move or second any item of business and to vote. If the Manager is not a Member, he shall have no such rights (unless by proxy), but he will preside at the meetings. A record

shall be maintained of the meetings of the Members. The Members may adopt their own rules of procedure, which shall not be inconsistent with this Agreement.

(d) Presumption of Assent. A Member of the Company who is present at a meeting of the Members at which action on any matter is taken shall be presumed to have assented to the action taken, unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by certified mail, return receipt requested, to the secretary of the meeting within five (5) days after the adjournment of the meeting. Such right to dissent shall not apply to a Member who voted in favor of such action.

(e) Informal Action of Members. Unless otherwise set forth in this Agreement or otherwise provided by law, any action required to be taken at a meeting of the Members, or any other action which may be taken at a meeting of the Members, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Required Majority.

2.9 Telephonic Meeting. Members of the Company may participate in any meeting of the Members by means of conference telephone or similar communication if all persons participating in such meeting can hear one another for the entire discussion of the matter(s) to be voted upon. Participating in a meeting pursuant to this Section 2.9 shall constitute presence in person at such meeting.

## ARTICLE 3.
## FISCAL MATTERS

3.1 Fiscal Year. The fiscal year of the Company shall begin on the first day of January and end on the last day of December of each year, unless otherwise determined by resolution of the Members.

3.2 Deposits. All funds of the Company shall be deposited from time to time to the credit of the Company in such banks, trust companies or other depositories as the Manager or the Members may select.

3.3 Checks, Drafts, Etc. All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company shall be signed by the Manager or by such Member or Members as the Members may specify.

3.4 Loans. No loans shall be contracted on behalf of the Company and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Members. Such authority may be general or confined to specific instances.

3.5 Contracts.  The Members may authorize any Member or agent of the Company to enter into any contract or execute any instrument in the name of and on behalf of the Company, and such authority may be general or confined to specific instances.

3.6 Accountant.  An Accountant may be selected from time to time by the Members to perform such tax and accounting services as may, from time to time, be required.  The Accountant may be removed by the Members without assigning any cause.

3.7 Legal Counsel.  One or more Attorney(s) at Law may be selected from time to time by the Members as the Company's Legal Counsel to review the legal affairs of the Company and to perform such other services as may be required and to report to the Members with respect thereto.  The Legal Counsel may be removed by the Members without assigning any cause.

3.8 Existing Obligations. The LLC shall not be responsible for any pre-existing receivables and/or debts/obligations of any of its members.

3.9 Insurance.

(a) In order to aid in the continued operation of the LLC after the death of a Member, the LLC may purchase, own and become the primary beneficiary of insurance policies on the lives of each of the Members in an amount of not less than $250,000.00. Upon the sale by a Member during his lifetime of all his LLC Interest, either to the LLC or to the other Members, the Selling Member may, within thirty days after the date of such sale, purchase from the LLC, for the cash value thereof, any policies of insurance on the life of such Selling Member then owned by the LLC.

(b) Upon the death of any Member, the sum of $250,000.00 from the proceeds of any insurance owned by the LLC on the life of the deceased Member shall be paid to the LLC.

## ARTICLE 4.
## LIMITED LIABILITY COMPANY INTERESTS

4.1 Limited Liability Company.  Limited Liability Company Interests (the "LLC Interests") are the personal property of each Member representing an equity interest in the Company and may, if only so desired by Members, be evidenced by a Certificate of Limited Liability Company Interest ("LLC Interest Certificate") issued by the Company. The Company shall be authorized to issue units ("Units") of LLC Interests and to admit new Members in respect of such LLC Interests.  Initially, each Member shall receive such number of Units as corresponds to his Profit Percentage, as set forth on Schedule A, described in Section 5.1 below.  The Company  may issue Units of LLC Interests for

cash, property, promissory note, services performed or to be performed, as incentive compensation, or for any other consideration determined by the Members to be appropriate. The Company also may issue rights, warrants, options, convertible securities or indebtedness, or other rights, which are exercisable for or convertible or exchangeable into Units of LLC Interests. The Company may, with the consent of the Required Majority, issue Units, in one or more series or classes, such series or classes to have such designations, powers, preferences, rights, qualifications, limitations and restrictions as the Required Majority determine, which determination or determinations, as the case may be, shall be set forth in a written instrument signed by the Required Majority, which written instrument shall be kept with the Company records. LLC Interests may be issued only with the consent of the Required Majority.

## ARTICLE 5.
### CAPITAL MATTERS, DETERMINATION OF PROFIT AND LIQUIDATION PERCENTAGES

5.1 Initial Contributions. Set forth in Schedule A hereto opposite the name and address of each Member is, among other things, his (i) initial capital contribution ("Capital Contribution") and (ii) percentage share in the profits of the Company ("Profit Percentage"). The initial Capital Contributions have been heretofore made or shall be made within five (5) business days after request thereof by the Manager.

5.2 Capital Accounts. A capital account (a "Capital Account") shall be established for each Member in the amount of such Member's initial Capital Contribution. A Member's Capital Account shall be maintained in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv) and Exhibit B, which is described in Section 6.2 below and which shall be attached hereto, and shall be increased by:

(a) the amount of any subsequent capital contribution made by such Member; and

(b) the amount of income or gain allocated to such Member pursuant to this Agreement;

and shall be decreased by:

(c) the amount of loss or deduction or non-deductible expenditure allocated to such Member pursuant to this Agreement; and
(d) the amount of any distribution to such Member.

5.3 Limit of Liability. Except as otherwise provided by law, the liability of each Member shall be limited to the aggregate amount of the capital contributions which such Member has made or is otherwise legally obligated to make in accordance with the provisions of this Agreement and the Members shall have no further personal liability to contribute money to, or in respect of, the debts, liabilities, contracts or any other obligations of the Company, nor shall the Members be personally liable for any obligations of the Company.

5.4 Capital Contributions.  Subject to Section 5.7 below, a Member shall not be required to lend any funds to the Company or to make any further capital contribution to the Company after his initial Capital Contribution is paid.  A Member shall not have any obligation to the Company or to any other Member to restore any negative balance in his capital account.  No Member may withdraw capital or receive any distributions except as specifically provided herein.  No interest shall be paid by the Company on any capital contributions to the Company.

5.5 Calculation of Profit Percentages.  The Profit Percentage of each Member shall be determined by dividing such Member's total number of issued and outstanding Units held by the total number of issued and outstanding Units of the Company's LLC Interests held by all Members.

5.6 Adjustments to Capitalization Schedule.  At any time that there is an event that would cause the information set forth on Schedule A to become no longer current (such as, but not necessarily limited to (i) the making of additional Capital Contributions by any Member, (ii) the admission of new Members, (iii) the Transfer of any LLC Interest, or (iv) the issuance of additional Units to any existing Member), Schedule A shall be deemed to be appropriately modified and adjusted to take into account the event which makes such modification and adjustment necessary.  Within a reasonable time after each such event, the Manager shall cause an updated Schedule A to be prepared, which updated Schedule A shall be available for review by the Members at the principal office of the Company.

5.7 Additional Capital Contributions.

(a) If, at any time or times hereafter, the Company requires funds in excess of the funds provided by the Members prior thereto, the Manager shall given written notice of such fact to all the Members, specifying in reasonable detail the amount and purpose of such required funds.  Unless a Required Majority determines otherwise, the Company shall attempt to raise  such funds through third party debt or equity.  In the event that (i) the Company is unable, in whole or in part, to raise such funds from third parties, or (ii) the Required Majority does not desire to raise such funds from third parties, then the Company shall raise such funds that constitute Necessary Funds (as defined below) from the Members.  With respect to all such required funds that constitute Necessary Funds, the Manager shall send written notice of a capital call to all Members indicating the total amount of capital needed (the "Capital Call Notice").  Within thirty (30) days after delivery of the Capital Call Notice, each Member shall contribute to the Company his proportionate share of the total amount of capital required as set forth in the Capital Call Notice, determined by dividing the number of Units held by such Member by the total number of Units outstanding.  Each Member shall receive additional Units in exchange for such Member's capital contribution based upon the Appraised Value thereof (as described in Section 7.10 below).

(b) If any Member fails to make additional capital contributions required pursuant to a Capital Call Notice (a "Defaulting Member"), the remaining Members each shall make loans to the Company ("Member Loans") in an amount equal to their proportionate share thereof, determined as set forth in the last sentence of paragraph 5.7(a) above (or in such other proportion as the Members may mutually agree). In such event, the Company shall use all commercially reasonable efforts to cause the Defaulting Member to make capital contributions required of the Defaulting Member (together with such other amounts as may be payable pursuant to paragraph 5.7(c) below) and, if and when the Company succeeds in such effort, the Company shall utilize such capital contributions to repay all Member Loans made by the remaining Members, together with interest thereon at the rate of ten percent (10%) per annum. In any event, the Company shall repay all Member Loans (together with interest) prior to making any distributions of profits. In addition, and notwithstanding the provisions of Sections 9.1 and 13.2 below, no Defaulting Member or any future holder of such Defaulting Member's Units shall be entitled to receive any distribution of profits until all other Members shall have received their full share of profit distributions pursuant to paragraph 9.1(a) or 13.2(a) below, as the case may be.

(c) In the event that any Defaulting Member fails to make any required additional capital contributions when required pursuant to paragraph 5.7(a) above, such Defaulting Member shall, in addition to the payment of required additional capital contributions, pay to the Company (i) interest on the amount of the required additional capital contributions at the rate of twelve percent (12%) per annum from the date that such additional capital contributions should have been made, (ii) all costs and expenses incurred by the Company to collect the required additional capital contributions and/or other amounts payable under clauses (i) or (iii) of this paragraph 5.7(c), including reasonable attorneys' fees and costs, and (iii) any other damages which the Company can demonstrate were caused, in whole or in part, by the Defaulting Member's failure to make required additional capital contributions.

(d) If a Defaulting Member fails to make additional capital contributions required pursuant to any Capital Call Notice, then, in addition to any other remedies that they may have hereunder or at law or in equity, the other Members (the "Nondefaulting Members"), if they unanimously agree, shall have the right to: (i) determine that the Member Loans made by them are capital contributions; or (ii) terminate and dissolve the Company. In the event that the Nondefaulting Members elect to treat the Member Loans as capital contributions, then effective as of the date of such election, additional Units shall be issued to the Nondefaulting Members on a pro rata basis in amounts necessary to cause (A) the aggregate Profit Percentages of the Nondefaulting Members to be increased, and (B) the Profit Percentage of the Defaulting Member to be reduced, in each case by the percentage amount obtained by subtracting from the Defaulting

Member's Profit Percentage in effect immediately prior to the election by the Nondefaulting Members, the product of (X) the Defaulting Member's Profit Percentage in effect immediately prior to such reduction, multiplied by (Y) a fraction, the numerator of which equals the amount requested of the Defaulting Member in the applicable Capital Call Notice, and the denominator of which shall be the gross aggregate amount of all capital contributions made to the Company by the Members immediately prior to the election to treat Member Loans as capital contributions. The Members hereby acknowledge to one another that because of the great likelihood of damage that may result and the difficulty in calculating the damage that may result from a failure of a Member to make a capital contribution when required, the agreement set forth herein permitting the Nondefaulting Members to elect to effect reductions of the Profit Percentage of a Defaulting Member for failure to make a required contribution and the basis of calculation for such reductions have been openly and freely negotiated and have been approved as fair and reasonable by the Members as parties who are sophisticated in business, real estate and finance.

(e) As used herein, "Necessary Funds" shall mean all funds needed by the Company which are in excess of the aggregate amount of the Company's reserves for such purpose to: (i) pay and perform when due the Company's covenants and obligations under any leases, contracts, agreements, notes, insurance policies, mortgages, commitments and other instruments to which the Company is or shall be a party or by which it or its assets shall be bound, and which were duly and properly approved and authorized by the Members, (ii) pay when due all taxes affecting the Company or any of its assets, (iii) comply with all legal requirements and insurance requirements now or hereafter in force which shall be applicable to the Company or any of its assets, (iv) pay when due the employees and creditors of the Company, where such employees were hired with the approval of the Members and debt to such creditors was approved by the Members, and (v) carry out any purchase, transaction or project, where funds required therefor have been expressly determined by the Required Majority to be "Necessary Funds".

(f) The provisions of this Section 5.7 are intended to be for the benefit of the Company and the Members only. No third party shall have the right to rely on the provisions of this Section 5.7 for any purpose.

## ARTICLE 6.
## ALLOCATIONS OF PROFITS AND LOSSES

6.1 Net Profits and Losses. The "Net Profits and Losses of the Company" shall be the net profits and losses of the Company for Federal income tax purposes as shown on the returns filed by the Company with the Internal Revenue Service, and as shall be further defined in an Exhibit B, which shall be established by the Members as soon as practicable after the date hereof and attached hereto at such time.

6.2 Allocation of Tax Items. Net Profit, Net Profit on Sale, Net Loss and Net Loss on Sale (as such terms shall be defined in Exhibit B) of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof shall be allocated to the Members each year in accordance with Exhibit B.

6.3 Allocations to Reflect Transfers of Interest. Upon the Transfer (as hereinafter defined) of all or any part of the LLC Interest of a Member as herein provided, Net Profit and Net Loss attributable to the LLC Interest so Transferred shall be allocated between the transferor and transferee as of the effective date of the Transfer, and such allocation shall be based upon the number of days during the applicable fiscal year of the Company that the Interest so transferred was held by each of them, without regard to the results of Company activities during the period in which each was the holder; provided, however, that Net Profit on Sale and Net Loss on Sale attributable to asset sales or other capital events shall be allocated in accordance with the Interests in the Company as held on the date of the asset sale or other capital event giving rise to such Net Profit on Sale or Net Loss on Sale. Distributions shall be made to the holder of record of the LLC Interest on the date of distribution.

## ARTICLE 7.
## TRANSFER OF LIMITED LIABILITY COMPANY INTERESTS

7.1 Restrictions on Transfers of LLC Interest. No Member shall, in any manner, convey, sell, transfer, pledge, bequeath, donate, assign, encumber or otherwise dispose of, whether voluntarily or involuntarily, including, but not limited to, pursuant to judicial order, legal process, execution, attachment or otherwise (each such transaction being referred to herein as a "Transfer") any LLC Interest which he now owns or hereafter acquires, except as expressly set forth in this Agreement. Any attempted Transfer of any LLC Interest, or any interest or right therein, made in violation of this Agreement shall be null and void. The transferee of such LLC Interest shall not be entitled to have such LLC Interest Transferred upon the books of the Company and no person shall be entitled to receive distributions thereon until such Transfer is rescinded.

7.2 Transfers to the Company. A Member may Transfer all or any part of his LLC Interest to the Company.

7.3 Transfers to Members. A Member may Transfer any portion of his LLC Interest (or any part thereof) at any time, either inter vivos or by will or intestacy, without the approval of the remaining Members to another Member; provided that such LLC Interest shall continue to be subject to all of the provisions of this Agreement.

7.5 Purchase Right of Company Upon Certain Events. In the event of (i) a Member's death or bankruptcy, or (ii) an involuntary Transfer of any LLC Interest which is or is held to be legally enforceable then, unless the business of the Company is not continued in accordance with Article 13 below, the Company and the Members shall have the right, but not the obligation, to repurchase such Member's LLC Interests at the

(1) Including as an item of gross income any tax-exempt income received by the Company;

(2) Treating as a deductible expense any expenditure of the Company described in Section 705(a)(2)(B), including amounts paid or incurred to organize the Company (unless an election is made pursuant to Code Section 709(b)) or any expenditure to promote the sale of interests in the Company, and treating deductions for any losses incurred in connection with the sale or exchange of Company property disallowed pursuant to Code Sections 267(a)(1) or 707(b) as expenditures described in Code Section 705(a)(2)(B);

(3) Taking into account Depreciation in lieu of depreciation, depletion, amortization, and other cost recovery deductions taken into account in computing total profit or loss;

(4) Excluding the gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes; and

(5) In the event of an adjustment of the Gross Asset Value of any Company asset which requires that the Capital Accounts of the Company be adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(e), (f), and (m), the amount of such adjustment is to be taken into account as Net Profit on Sale or Net Loss on Sale pursuant to this Exhibit B.

Once an item of income, gain, loss or deductions has been included in the initial computation of Net Profit or Net Loss or is subjected to the special allocation rules in this Exhibit B, Net Profit or Net Loss shall be recomputed without regard to such item.

(k) "Net Profit on Sale or Net Loss on Sale" shall mean the gain or loss resulting from the disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes, after deduction of any costs and expenses incurred by the Company in connection with such disposition, and computed by reference to the Gross Asset Value of such property rather than its adjusted basis.

(l) "Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulation Sections 1.704-2(b)(1) and (c).

(m) "Nonrecourse Liabilities" shall have the meaning set forth in Treasury Regulation Section 1.704-2(b)(3).

Appraised Value, in which event the Member, or estate of the deceased Member, or other transferee in such involuntary Transfer, as the case may be, shall sell the same to the Company or the Members, as the case may be. Otherwise, the Company shall be dissolved subject to the continuation rights set forth in such Article 13. Any election to repurchase shall be made by Members holding the Required Majority and shall be made within 90 days after (i) the applicable Member or other person's death or bankruptcy, or (ii) the receipt of notice by the Members of the involuntary Transfer. Any such repurchase by the remaining Members shall be made on a pro rata basis calculated based upon the total number of Units of LLC Interests held by each such Member, unless otherwise agreed by the Members. Closing on such repurchase shall occur within twelve (12) months from the date of such death or bankruptcy. If the Company is continued pursuant to Article 13 and the Company and the Members do not make the election to repurchase, the Member or, if and as applicable, his executor, administrator, guardian or other legal representative, or heirs immediately and without any affirmative action by any person shall be deemed to be the Member(s) and the holder(s) of the Member's LLC Interest in the Company. If the Company and the Members do not make the election to repurchase, the provisions of this Section 7.6 shall again apply in the event that there shall be a subsequent event which falls within the scope of this paragraph. For example, if the Company and the Members do not make an election under this paragraph to repurchase upon the retirement of a Member. The provisions of this paragraph also shall apply to any assignee or transferee of all or any portion of a Member's LLC Interest.

7.9 Termination Events Regarding Members. In the event of a Member's death or bankruptcy, then unless the Company is continued pursuant to Article 13 below, the Company shall be dissolved in accordance with such Article 13. If the Company is continued pursuant to Article 13, the Member or, if and as applicable, his executor, administrator, guardian or other personal representative, or heirs immediately and without any affirmative action by any person shall be deemed to be the assignee(s) of the Member, and therefore shall be deemed to be the holder(s) of the Member's LLC Interests in the Company.

7.10 Appraised Value. In the event that this Agreement requires that an "Appraised Value" be determined, the Manager shall notify the other Members of an intent to value LLC Interests by the appraisal procedure set forth below.

(a) The Affected Member (as defined below) and those Members other than the Affected Member (the "Remaining Members") may agree on the Appraised Value within twenty (20) days from the delivery of the notice of election to establish the Appraised Value. If the Appraised Value is not agreed upon by the Remaining Members and the Affected Member within twenty (20) days from the delivery of the notice of such election, the Appraised Value shall be determined by two appraisers, one to be selected by the Affected Member and one to be selected by the Remaining Members; provided, however, if the Remaining Members and the Affected Member so agree, the Appraised Value may be determined by one appraiser selected jointly by the Remaining Members

and the Affected Member. Each appraiser selected hereunder shall have performed at least two business appraisals for a state or federal court proceeding or a financial institution, within the last two years. Each such appraiser shall be disinterested, objective and without any business dealings with any of the Members prior to his appointment. The Company and each of the Members shall fully cooperate with each appraiser selected hereunder in order to permit each such appraiser to adequately perform his appraisal. The Appraised Value shall be the average of the valuations determined by such appraisers; provided, however, that (i) if the difference between the valuations is more than 50% of the lower valuation, then the Appraised Value shall be equal to the average of such valuations plus 10% of such average; (ii) if a party fails to select an appraiser within thirty (30) days from the date of receipt of the written request from the other party for appointment of his appraiser, or if an appraiser fails to submit his valuation to all Members and the Company within sixty (60) days from the date of his appointment, then the Appraised Value shall be the valuation of the other appraiser; and (iii) if the parties shall have selected only one appraiser, then the Appraised Value shall be the valuation of such appraiser. The expenses of any such appraisal shall be borne pro rata by the Affected Member and the Remaining Members, based upon the number of Units held by them immediately prior to the appraisal; provided, however, if the Remaining Members and the Affected Member so agree, the Company may bear all costs of the appraisals.

(b) As used in this Agreement, the term "Affected Member" means (i) the Defaulting Member, in the case of an appraisal pursuant to Section 5.7 above, or (ii) the bankrupt Member, the estate or personal representative of a deceased Member, or the transferee in an involuntary Transfer.

## ARTICLE 8.
## BOOKS AND RECORDS; REPORTS AND NOTICES

8.1 Books and Records. The Manager shall keep, or cause to be kept, full and accurate books and records of the Company. The books and records of the Company shall be kept at the principal office of the Company or at such other places as the Members shall from time to time determine.

8.2 Right of Inspection. Any Member of the Company shall have the right, upon written demand stating the purpose thereof, to examine for any proper purpose and during normal business hours, the books and records of account, minutes and records of Members and to make copies thereof. A proper purpose shall mean a purpose reasonably related to such person's interest as a Member. Such inspection may be made by any agent or attorney of the Member. Upon the written request of any Member of the Company, it shall mail to such Member its most recent financial statements, showing in reasonable detail its assets and liabilities and the results of its operations.

8.3 Financial Records. All financial records shall be maintained and reported based on generally accepted accounting principles.

## ARTICLE 9.
## DISTRIBUTION OF PROFITS

9.1 Distribution of Profits. Members holding the Required Majority may from time to time declare, and the Company may distribute, accumulated profits agreed by such Members to be not necessary for the cash needs of the Company's business. All such amounts shall be distributed in the following strict order of priority:

(a) First, return of the initial Capital Contributions and any subsequent Capital Contributions of the Members. If the amounts declared to be available for distribution are not sufficient to make distributions to all such Members in the full amount to which they are entitled, distributions shall be made to such Members pro rata in accordance with the respective full amounts to which such Members would be entitled; and

(b) Second, the balance to the Members pro rata in accordance with their Profit Percentages.

9.2 Tax Payment Distributions. As an exception to the cash-distribution priorities established under Section 9.1, the Members may make distributions to the Members from time to time to fund the payment of income-tax liabilities (if any) incurred by the Members with respect to taxable income of the Company. Any such distributions ("Tax Payment Distributions") shall be made to all Members pro rata in accordance with their Profit Percentages. Tax Payment Distributions shall be made only from accumulated profits agreed by the Members to be not necessary for the cash needs of the Company's business (including repayment of Company debt). The timing and amount of Tax Payment Distributions (if any) shall be within the sole discretion of the Members.

9.3 Repurchases. Notwithstanding the provisions of Section 9.1 above, the Company may repurchase all or any portion of a Member's LLC Interest and may utilize accumulated profits of the Company therefor.

## ARTICLE 10.
## OFFICERS

10.1 Manager. The Manager shall be the chief executive officer of the Company responsible for the general overall supervision of the business and affairs of the Company. The Manager may also have such other titles and hold such other offices as the Required Majority shall so designate (which titles may include, but not necessarily be limited to, president, chairman and/or chief operating officer). He shall, when present, preside at all meetings of the Members. The Manager may sign, on behalf of the Company, such deeds, mortgages, bonds, contracts or other instruments which have been appropriately authorized to be executed by the Members except when the

signing or execution thereof shall be expressly delegated by the Members, this Agreement or statute to some other Officer or agent of the Company; and, in general, the Manager shall perform all duties as may be prescribed by the Members from time to time. Unless the Members otherwise prescribe, the Manager may carry out any or all of his duties through other persons to whom he may delegate responsibilities. The specific authority and responsibility of the Manager shall also include the following:

(a) The Manager shall effectuate this Agreement and the regulations and decisions of the Members.

(b) The Manager shall direct and supervise the operations of the Company.

(c) The Manager, within such parameters as may be set by the Members, shall establish such charges for services and products of the Company as may be necessary to provide adequate income for the efficient operation of the Company.

(d) The Manager, within the budget established by the Members, shall set and adjust wages and rates of pay for all personnel of the Company and shall appoint, hire and dismiss all personnel and regulate their hours of work.

(e) The Manager shall keep the Members advised in all matters pertaining to the operation of the Company, services rendered, operating income and expense, financial position, and, to this end, shall prepare and submit a report to the Members at each regular meeting and at other times as may be directed by the Members.

10.2 Executive Officer. Gerald J. Mullaney, Jr. is hereby appointed to serve as Manager, President and Chief Executive Officer and to act in accordance with the provisions of Section 10.1 above. He shall hold office in accordance with the provisions of section 10.4 below.

10.3 Other Officers. The Company may, at the discretion of Members holding the Required Majority, have additional Officers including, without limitation, one or more Vice-Managers (who may also be vice-presidents), a Secretary and one or more Assistant Secretaries and a Treasurer and one or more Assistant Treasurers. Officers need not be selected from among the Members. One person may hold two or more offices, except one person may not hold both the office of Manager and the office of Secretary. When the incumbent of an office is (as determined by the incumbent himself or by the Members) unable to perform the duties of such office, or an office is vacant (both such situations referred to hereafter as the "absence" of the Officer), the duties of the office shall be performed by the person specified by the Members.

10.4 Election and Tenure. The Officers of the Company shall be elected annually by the Members at the annual meeting. Each Officer shall hold office from the date of his election until the next annual meeting and until his successor shall have been elected, unless he shall sooner resign or be removed.

10.5 Resignations and Removal. Any Officer may resign at any time by giving written notice to the Manager or to all of the Members, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Any Officer may be removed at any time by the Members with or without cause.

10.6 Vacancies. A vacancy in any office may be filled for the unexpired portion of the term by the Members.

10.7 Salaries. The salaries of the officers shall be fixed from time to time by the Members and no officer shall be prevented from receiving such salary by reason of the fact that he is also a Member of the Company.

## ARTICLE 11.
## MISCELLANEOUS

11.1 Notice. Any notice required or permitted to be given, pursuant to the provisions of the Statute or this Agreement, shall be effective as of the date personally delivered, or if sent by mail, on the date deposited with the United States Postal Service, prepaid and addressed to the intended receiver at his last known address as shown in the records of the Company.

11.2 Waiver of Notice. Whenever any notice is required to be given pursuant to the provisions of the Statute or this Agreement, a waiver thereof, in writing, signed by the persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

11.3 Indemnification By Company. To the fullest extent permitted by law, the Company shall indemnify and hold harmless any person who was or is a party defendant or is threatened to be made a party defendant to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigation (other than an action by or in the right of the Company) by reason of the fact that he is or was a Member of the Company, officer, employee or agent of the Company, or is or was serving at the request of the Company, against any and all losses, claims, damages, expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if the party to be indemnified acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo

contendere or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

### 11.4 Indemnification Funding.

(a) To the fullest extent permitted by law, expenses incurred by an indemnified party in defending any claim, demand, action, suit or proceeding subject to Section 11.3 shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon the receipt by the Company of an undertaking by or on behalf of the indemnified party to repay such amount unless it shall be determined that such person is entitled to be indemnified as authorized in Section 11.3.

(b) The indemnification of Section 11.3 shall be in addition to any other rights of an indemnified party under any agreement, pursuant to any vote of the Members, as a matter of law or otherwise, and shall continue as to an indemnified party who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and personal representatives of the indemnified party.

(c) Any indemnification under Section 11.3 shall be satisfied solely out of the assets of the Company. The Company may obtain insurance in order to satisfy its indemnification obligations, either in whole or in part. In no event may an indemnified party subject any Member to personal liability by reason of these indemnification provisions. An indemnified party shall not be denied indemnification under Section 11.3 because the indemnified party had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of this Agreement.

### 11.5 Anticipated Transactions.

It is anticipated and acknowledged that the Members and Officers will have other legal and financial relationships in addition to their relationship with the Company. It is expressly understood and agreed that no Member shall be required by this Agreement to devote his entire time or attention to the business of the Company or shall be restricted by this Agreement in any way from participating in other businesses or activities. The provisions of this Section 11.5 shall not supersede any agreement between the Company and any Member contained in any employment agreement, consulting agreement, confidentiality agreement, distribution agreement, non-competition agreement or other agreement.

### 11.6 Further Assurances.

Each of the parties agrees to take such further actions and execute and deliver such documents as may be reasonably necessary or appropriate to effectuate the terms of this Agreement.

11.7 Applicable Law.  The validity, construction, interpretation, and effect of this Agreement shall be governed by Pennsylvania law, without regard to principles of choice of laws.

11.8 Construction.  The paragraph headings of this Agreement are for convenience of reference only and do not form a part of the terms, conditions, or covenants of this Agreement or give full notice thereof.  As used in the Agreement, the masculine includes the feminine, and the single includes the plural.

11.9 Benefit.  This Agreement shall be binding on, and inure to the benefit of, the parties hereto and their respective heirs, executors, administrators, successors, and permitted assigns.

11.10 Entire Agreement.  This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof, no other representations or covenants having induced any party to enter into this Agreement.

11.11 Severability.  If any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other document.

11.12 Definitions.  As used herein, the following terms shall have the following meanings:

(a) The term "person" shall include any individual, corporation, partnership, association, trust, joint stock company or unincorporated organization;

(b) The term "bankruptcy" of a person shall be deemed to have occurred upon the happening of any of the following:  (i) the filing of an application by such person for, or a consent to, the appointment of a trustee of its or his assets; (ii) the filing by such person of a voluntary petition in bankruptcy or the seeking of relief under Title 11 of the United States Code, as now constituted or hereafter amended, or the filing of a pleading in any court of record admitting in writing its or his inability to pay its or his debts as they come due; (iii) the making by such person of a general assignment for the benefit of creditors; (iv) the filing by such person of an answer admitting the material allegations of, or its or his consenting to, or defaulting in answering, a bankruptcy petition seeking relief under Title 11 of the United States Code, as now constituted or as hereafter amended; or (v) the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such person a bankruptcy or for relief in respect of such person or appointing a trustee of its or his assets, and such order, judgment or decree continue unstayed and in effect for any period of 60 consecutive days.

11.13 Counterparts.  This Agreement may be executed in counterparts which when taken together shall constitute one agreement binding on all the parties notwithstanding that all the parties are not signatories to the same counterpart.

## ARTICLE 12,
## AMENDMENTS

12.1 Amendments.  This Agreement may be altered, amended, restated, or repealed and a new Agreement may be adopted, at any time or from time to time, by Members holding a Required Majority.

## ARTICLE 13.
## DISSOLUTION

13.1 Events Causing Dissolution.  As required under the Statute, the Members agree that the Company shall be dissolved upon the:

(a) written consent of all Members;

(b) upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member;

(c) the occurrence of any other event which terminates the continued membership of a Member in the Company; provided, however, the parties agree that, upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a  Member, or the occurrence of any other event which terminates the continued membership of a Member, the Company shall have the right to continue its business if within ninety (90) days following the dissolution event, all of the Members shall have consented to continue the business of the Company.

13.2 Liquidation.  Upon the termination and dissolution of the Company, the Manager or, if there is no Manager, any person elected to perform such liquidation by the written consent of the Members shall proceed with the liquidation of the Company, and the proceeds of such liquidation shall be applied and distributed in the following order of priority:

(a) First, to the Members pro rata in accordance with their positive Capital Account balances, to the extent of such balances; and

(b) Second, to all Members pro rata in accordance with their relative Profit Percentages.

13.3 Distributions in Kind.  In the event it becomes necessary to make a distribution of Company property in kind, such property shall be transferred and conveyed to the Members or their assignees so as to vest in each of them an interest in the whole of said property equal to their interests in the distribution of proceeds in accordance with Article 9 hereof.  Any valuation of Company property shall be made by a firm of certified public accountants, appraisers or investment bankers selected by the Manager in its sole discretion.

THE UNDERSIGNED, being all of the Members of Hopwood Farm, LLC, a Pennsylvania Limited Liability Company, have duly executed this Agreement on the day and year first written above.

Gerald J. Mullaney, Jr.

Martin P. Mullaney

6/8/02

Paul F. Newlin

David C. Marchese

McCauley Associates Partnership

By:

Title: Partner

## EXHIBIT B

## VALUATION SCHEDULE

Valuation of LLC Interest made in conformity with and pursuant to an Agreement dated as of _____, by and among _____, _____ and _____.

Valuation of Voting LLC Interest

| Date | Valuation | Signatures |
|------|-----------|------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Valuation of Non-Voting LLC Interest

| Date | Valuation | Signatures |
|------|-----------|------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |