# EXHIBIT "A"

## HOPWOOD FARM, LLC
## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

**THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT** (this "Agreement"), dated *Nov. 18th*, 2005, relating to Hopwood Farm, LLC (the "Company") is by and among Gerald J. Mullaney, Jr., Martin P. Mullaney, Paul F. Newlin and David C. Marchese and McCauley Associates Partnership and those persons who hereafter join in the Company by executing a Joinder Agreement substantially in the form of Exhibit A hereto (such persons are sometimes referred to individually as a "Member" and collectively as "Members").

## BACKGROUND

The Members have formed the Company for the purpose of owning and managing real property and related activity, as well as for the purpose of carrying on any other lawful business, purpose or activity which a Pennsylvania limited liability company is not prohibited from carrying on. The Members shall own the entire equity interest in the Company at the time of its formation and wish to protect against ownership of an equity interest in the Company by persons who are not willing or able to carry out the intent of the Members in forming the Company. Accordingly, the Members have agreed to restrict transferability of equity interests and provide for certain other matters relating to the Company, all as is more fully described in this Agreement.

**NOW THEREFORE,** the Company and the Members, in consideration of the foregoing and of the mutual covenants contained herein, and intending to be legally bound hereby, agree as follows:

## ARTICLE 1.
## OFFICES

**1.1 Principal Office.** The principal office of the Company shall be located at such place as the Members shall designate. The Company may have such other offices as the Members may designate or as the business of the Company may from time to time require.

**1.2 Registered Office.** The registered office of the Company, required by the Pennsylvania Limited Liability Company Act (the "Statute") to be maintained in the Commonwealth of Pennsylvania, is 3881 Skippack Pike, P.O. Box 1368, Skippack, Pennsylvania, 19474. The registered office may be changed from time to time by action of the Members and by filing the prescribed form with the Pennsylvania Secretary of State.

**1.3 Filing of Certificates.** The Members have caused a Certificate of Organization to be prepared and filed in accordance with the Statute. The Manager (as hereinafter defined) is authorized to file and record any documents required by or appropriate under the laws of any jurisdiction in which the Company shall carry on its

business or otherwise necessary or appropriate in connection with the preservation of the limited liability of the Members.

## ARTICLE 2.
## MEETINGS

2.1 Annual Meeting. The annual meeting of the Members shall be held on the first Tuesday of March each year, beginning with the year 2006 at the principal office of the Company, or on such other date or at such other place as the Members shall determine, for the purpose of electing Officers (as more fully described in Article 10 herein) and for the transaction of such other business as may come before the meeting. If the day fixed for the annual meeting shall not be a business day, such meeting shall be held on the next succeeding business day. If the election shall not be held on the day designated herein for the annual meeting of the Members, or at any adjournment thereof, the Members shall cause the election to be held at a special meeting of the Members as soon thereafter as it may conveniently be held. The failure of the Company to hold any annual meeting on the designated date shall not in any manner render the acts of the Company invalid, or otherwise adversely affect such acts.

2.2 Regular Meetings. The Members may, by resolution, prescribe the time and place for the holding of regular meetings and may provide that the adoption of any such resolution shall constitute notice of such regular meetings. If the Members do not prescribe the time and place for the holding of regular meetings, such regular meetings shall be held at the time and place specified by the Manager in the notice of each such regular meeting. The Company may, but shall not be required, to conduct regular meetings.

2.3 Special Meetings. Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by the Manager or by any Member. The Company may, but shall not be required to, conduct special meetings.

2.4 Notice of Meeting. Written or telephonic notice stating the place, day and hour of any meeting and, in case of a special meeting, the purposes for which the meeting is called shall be delivered not less than five days before the date of the meeting, either personally or by mail, by or at the direction of the Manager, to each Member of record. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the Member at his address as it appears on the books of the Company, with postage thereon prepaid. When all of the Members of the Company are present at any meeting, or if some, but not all, of the Members are present and those not present sign in writing a waiver of notice of such meeting, or subsequently ratify all the proceedings thereof, the transactions of such meeting are as valid as if a meeting were formally called and notice had been given.

2.5 Quorum. At any meeting of the Members, 51% of the then issued and outstanding Units of LLC Interests (as such terms are hereinafter defined), represented in person or by proxy, shall constitute a quorum at a meeting of the Members. If less than said percentage of the interests are represented at a meeting, a majority of the interests so represented may adjourn the meeting from time to time without further notice. At such reconvened meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified. The Members present at a duly convened meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum.

2.6 Proxies. At all meetings of Members, a Member may vote by proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Such proxy shall be filed with the Manager of the Company before or at the time of the meeting. No proxy shall be valid after three months from the date of execution thereof, unless otherwise provided in the proxy.

2.7 Voting by Certain Members. Any LLC Interest (as defined within Section 4.1 of this Agreement) held in the name of a corporation, partnership or company, may be voted by such officer, partner, agent or proxy as the charter documents of such entity may determine. If a Member dies or a court of competent jurisdiction adjudges him to be incompetent to manage his property, the Member's executor, administrator, guardian or personal representative may exercise all of that Member's rights for the purpose of settling his estate or administering his property.

2.8 Manner of Acting.

(a) Formal Action by Members. Unless otherwise set forth in this Agreement, the affirmative vote of the holders of at least 51% of the then outstanding Units of LLC Interests (the "Required Majority") shall be the act of the Members.

(b) Fifty-One Percent Vote Required. The affirmative vote or consent of Fifty-One Percent of LLC Interests held by the Voting Members shall be required to authorize a manager, Member, or other person to do any act on behalf of the company that contravenes the certificate of organization or a written provision of the operating agreement, including, without limitation, any provision that expressly limits the purpose, business or affairs of the company or the conduct thereof.

(c) Procedure. The Manager of the Company shall preside at meetings of the Members. If the Manager is a Member, he shall have all rights and duties of Members at the meeting, including but not limited to the rights to move or second any item of business and to vote. If the Manager is not a Member, he shall have no such rights (unless by proxy), but he will preside at the meetings. A record

shall be maintained of the meetings of the Members.  The Members may adopt their own rules of procedure, which shall not be inconsistent with this Agreement.

(d) Presumption of Assent.  A Member of the Company who is present at a meeting of the Members at which action on any matter is taken shall be presumed to have assented to the action taken, unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by certified mail, return receipt requested, to the secretary of the meeting within five (5) days after the adjournment of the meeting.  Such right to dissent shall not apply to a Member who voted in favor of such action.

(e) Informal Action of Members.  Unless otherwise set forth in this Agreement or otherwise provided by law, any action required to be taken at a meeting of the Members, or any other action which may be taken at a meeting of the Members, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Required Majority.

2.9 Telephonic Meeting.  Members of the Company may participate in any meeting of the Members by means of conference telephone or similar communication if all persons participating in such meeting can hear one another for the entire discussion of the matter(s) to be voted upon.  Participating in a meeting pursuant to this Section 2.9 shall constitute presence in person at such meeting.

## ARTICLE 3.
## FISCAL MATTERS

3.1 Fiscal Year.  The fiscal year of the Company shall begin on the first day of January and end on the last day of December of each year, unless otherwise determined by resolution of the  Members.

3.2 Deposits.  All funds of the Company shall be deposited from time to time to the credit of the Company in such banks, trust companies or other depositories as the Manager or the  Members may select.

3.3 Checks, Drafts, Etc.  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company shall be signed by the Manager or by such Member or Members as the Members may specify.

3.4 Loans.  No loans shall be contracted on behalf of the Company and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Members.  Such authority may be general or confined to specific instances.

3.5 Contracts.  The Members may authorize any Member or agent of the Company to enter into any contract or execute any instrument in the name of and on behalf of the Company, and such authority may be general or confined to specific instances.

3.6 Accountant.  An Accountant may be selected from time to time by the Members to perform such tax and accounting services as may, from time to time, be required.  The Accountant may be removed by the Members without assigning any cause.

3.7 Legal Counsel.  One or more Attorney(s) at Law may be selected from time to time by the Members as the Company's Legal Counsel to review the legal affairs of the Company and to perform such other services as may be required and to report to the Members with respect thereto.  The Legal Counsel may be removed by the Members without assigning any cause.

3.8 Existing Obligations. The LLC shall not be responsible for any pre-existing receivables and/or debts/obligations of any of its members.

3.9 Insurance.

(a) In order to aid in the continued operation of the LLC after the death of a Member, the LLC may purchase, own and become the primary beneficiary of insurance policies on the lives of each of the Members in an amount of not less than $250,000.00. Upon the sale by a Member during his lifetime of all his LLC Interest, either to the LLC or to the other Members, the Selling Member may, within thirty days after the date of such sale, purchase from the LLC, for the cash value thereof, any policies of insurance on the life of such Selling Member then owned by the LLC.

(b) Upon the death of any Member, the sum of $250,000.00 from the proceeds of any insurance owned by the LLC on the life of the deceased Member shall be paid to the LLC.

## ARTICLE 4.
## LIMITED LIABILITY COMPANY INTERESTS

4.1 Limited Liability Company.  Limited Liability Company Interests (the "LLC Interests") are the personal property of each Member representing an equity interest in the Company and may, if only so desired by Members, be evidenced by a Certificate of Limited Liability Company Interest ("LLC Interest Certificate") issued by the Company. The Company shall be authorized to issue units ("Units") of LLC Interests and to admit new Members in respect of such LLC Interests.  Initially, each Member shall receive such number of Units as corresponds to his Profit Percentage, as set forth on Schedule A, described in Section 5.1 below.  The Company may issue Units of LLC Interests for

cash, property, promissory note, services performed or to be performed, as incentive compensation, or for any other consideration determined by the Members to be appropriate. The Company also may issue rights, warrants, options, convertible securities or indebtedness, or other rights, which are exercisable for or convertible or exchangeable into Units of LLC Interests. The Company may, with the consent of the Required Majority, issue Units, in one or more series or classes, such series or classes to have such designations, powers, preferences, rights, qualifications, limitations and restrictions as the Required Majority determine, which determination or determinations, as the case may be, shall be set forth in a written instrument signed by the Required Majority, which written instrument shall be kept with the Company records. LLC Interests may be issued only with the consent of the Required Majority.

## ARTICLE 5.
## CAPITAL MATTERS, DETERMINATION OF PROFIT
## AND LIQUIDATION PERCENTAGES

5.1 Initial Contributions. Set forth in Schedule A hereto opposite the name and address of each Member is, among other things, his (i) initial capital contribution ("Capital Contribution") and (ii) percentage share in the profits of the Company ("Profit Percentage"). The initial Capital Contributions have been heretofore made or shall be made within five (5) business days after request thereof by the Manager.

5.2 Capital Accounts. A capital account (a "Capital Account") shall be established for each Member in the amount of such Member's initial Capital Contribution. A Member's Capital Account shall be maintained in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv) and Exhibit B, which is described in Section 6.2 below and which shall be attached hereto, and shall be increased by:

    (a)  the amount of any subsequent capital contribution made by such Member; and

    (b)  the amount of income or gain allocated to such Member pursuant to this Agreement;

and shall be decreased by:

    (c)  the amount of loss or deduction or non-deductible expenditure allocated to such Member pursuant to this Agreement; and

    (d)  the amount of any distribution to such Member.

5.3 Limit of Liability. Except as otherwise provided by law, the liability of each Member shall be limited to the aggregate amount of the capital contributions which such Member has made or is otherwise legally obligated to make in accordance with the provisions of this Agreement and the Members shall have no further personal liability to contribute money to, or in respect of, the debts, liabilities, contracts or any other obligations of the Company, nor shall the Members be personally liable for any obligations of the Company.

5.4 Capital Contributions.  Subject to Section 5.7 below, a Member shall not be required to lend any funds to the Company or to make any further capital contribution to the Company after his initial Capital Contribution is paid.  A Member shall not have any obligation to the Company or to any other Member to restore any negative balance in his capital account.  No Member may withdraw capital or receive any distributions except as specifically provided herein.  No interest shall be paid by the Company on any capital contributions to the Company.

5.5 Calculation of Profit Percentages.  The Profit Percentage of each Member shall be determined by dividing such Member's total number of issued and outstanding Units held by the total number of issued and outstanding Units of the Company's LLC Interests held by all Members.

5.6 Adjustments to Capitalization Schedule.  At any time that there is an event that would cause the information set forth on Schedule A to become no longer current (such as, but not necessarily limited to (i) the making of additional Capital Contributions by any Member, (ii) the admission of new Members, (iii) the Transfer of any LLC Interest, or (iv) the issuance of additional Units to any existing Member), Schedule A shall be deemed to be appropriately modified and adjusted to take into account the event which makes such modification and adjustment necessary.  Within a reasonable time after each such event, the Manager shall cause an updated Schedule A to be prepared, which updated Schedule A shall be available for review by the Members at the principal office of the Company.

5.7 Additional Capital Contributions.

(a) If, at any time or times hereafter, the Company requires funds in excess of the funds provided by the Members prior thereto, the Manager shall given written notice of such fact to all the Members, specifying in reasonable detail the amount and purpose of such required funds.  Unless a Required Majority determines otherwise, the Company shall attempt to raise  such funds through third party debt or equity.  In the event that (i) the Company is unable, in whole or in part, to raise such funds from third parties, or (ii) the Required Majority does not desire to raise such funds from third parties, then the Company shall raise such funds that constitute Necessary Funds (as defined below) from the Members.  With respect to all such required funds that constitute Necessary Funds, the Manager shall send written notice of a capital call to all Members indicating the total amount of capital needed (the "Capital Call Notice").  Within thirty (30) days after delivery of the Capital Call Notice, each Member shall contribute to the Company his proportionate share of the total amount of capital required as set forth in the Capital Call Notice, determined by dividing the number of Units held by such Member by the total number of Units outstanding.  Each Member shall receive additional Units in exchange for such Member's capital contribution based upon the Appraised Value thereof (as described in Section 7.10 below).

(b) If any Member fails to make additional capital contributions required pursuant to a Capital Call Notice (a "Defaulting Member"), the remaining Members each shall make loans to the Company ("Member Loans") in an amount equal to their proportionate share thereof, determined as set forth in the last sentence of paragraph 5.7(a) above (or in such other proportion as the Members may mutually agree). In such event, the Company shall use all commercially reasonable efforts to cause the Defaulting Member to make capital contributions required of the Defaulting Member (together with such other amounts as may be payable pursuant to paragraph 5.7(c) below) and, if and when the Company succeeds in such effort, the Company shall utilize such capital contributions to repay all Member Loans made by the remaining Members, together with interest thereon at the rate of ten percent (10%) per annum. In any event, the Company shall repay all Member Loans (together with interest) prior to making any distributions of profits. In addition, and notwithstanding the provisions of Sections 9.1 and 13.2 below, no Defaulting Member or any future holder of such Defaulting Member's Units shall be entitled to receive any distribution of profits until all other Members shall have received their full share of profit distributions pursuant to paragraph 9.1(a) or 13.2(a) below, as the case may be.

(c) In the event that any Defaulting Member fails to make any required additional capital contributions when required pursuant to paragraph 5.7(a) above, such Defaulting Member shall, in addition to the payment of required additional capital contributions, pay to the Company (i) interest on the amount of the required additional capital contributions at the rate of twelve percent (12%) per annum from the date that such additional capital contributions should have been made, (ii) all costs and expenses incurred by the Company to collect the required additional capital contributions and/or other amounts payable under clauses (i) or (iii) of this paragraph 5.7(c), including reasonable attorneys' fees and costs, and (iii) any other damages which the Company can demonstrate were caused, in whole or in part, by the Defaulting Member's failure to make required additional capital contributions.

(d) If a Defaulting Member fails to make additional capital contributions required pursuant to any Capital Call Notice, then, in addition to any other remedies that they may have hereunder or at law or in equity, the other Members (the "Nondefaulting Members"), if they unanimously agree, shall have the right to: (i) determine that the Member Loans made by them are capital contributions; or (ii) terminate and dissolve the Company. In the event that the Nondefaulting Members elect to treat the Member Loans as capital contributions, then effective as of the date of such election, additional Units shall be issued to the Nondefaulting Members on a pro rata basis in amounts necessary to cause (A) the aggregate Profit Percentages of the Nondefaulting Members to be increased, and (B) the Profit Percentage of the Defaulting Member to be reduced, in each case by the percentage amount obtained by subtracting from the Defaulting

Member's Profit Percentage in effect immediately prior to the election by the Nondefaulting Members, the product of (X) the Defaulting Member's Profit Percentage in effect immediately prior to such reduction, multiplied by (Y) a fraction, the numerator of which equals the amount requested of the Defaulting Member in the applicable Capital Call Notice, and the denominator of which shall be the gross aggregate amount of all capital contributions made to the Company by the Members immediately prior to the election to treat Member Loans as capital contributions. The Members hereby acknowledge to one another that because of the great likelihood of damage that may result and the difficulty in calculating the damage that may result from a failure of a Member to make a capital contribution when required, the agreement set forth herein permitting the Nondefaulting Members to elect to effect reductions of the Profit Percentage of a Defaulting Member for failure to make a required contribution and the basis of calculation for such reductions have been openly and freely negotiated and have been approved as fair and reasonable by the Members as parties who are sophisticated in business, real estate and finance.

(e) As used herein, "Necessary Funds" shall mean all funds needed by the Company which are in excess of the aggregate amount of the Company's reserves for such purpose to: (i) pay and perform when due the Company's covenants and obligations under any leases, contracts, agreements, notes, insurance policies, mortgages, commitments and other instruments to which the Company is or shall be a party or by which it or its assets shall be bound, and which were duly and properly approved and authorized by the Members, (ii) pay when due all taxes affecting the Company or any of its assets, (iii) comply with all legal requirements and insurance requirements now or hereafter in force which shall be applicable to the Company or any of its assets, (iv) pay when due the employees and creditors of the Company, where such employees were hired with the approval of the Members and debt to such creditors was approved by the Members, and (v) carry out any purchase, transaction or project, where funds required therefor have been expressly determined by the Required Majority to be "Necessary Funds".

(f) The provisions of this Section 5.7 are intended to be for the benefit of the Company and the Members only. No third party shall have the right to rely on the provisions of this Section 5.7 for any purpose.

## ARTICLE 6.
## ALLOCATIONS OF PROFITS AND LOSSES

6.1 Net Profits and Losses. The "Net Profits and Losses of the Company" shall be the net profits and losses of the Company for Federal income tax purposes as shown on the returns filed by the Company with the Internal Revenue Service, and as shall be further defined in an Exhibit B, which shall be established by the Members as soon as practicable after the date hereof and attached hereto at such time.

6.2 Allocation of Tax Items.  Net Profit, Net Profit on Sale, Net Loss and Net Loss on Sale (as such terms shall be defined in Exhibit B) of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof shall be allocated to the Members each year in accordance with Exhibit B.

6.3 Allocations to Reflect Transfers of Interest.  Upon the Transfer (as hereinafter defined) of all or any part of the LLC Interest of a Member as herein provided, Net Profit and Net Loss attributable to the LLC Interest so Transferred shall be allocated between the transferor and transferee as of the effective date of the Transfer, and such allocation shall be based upon the number of days during the applicable fiscal year of the Company that the Interest so transferred was held by each of them, without regard to the results of Company activities during the period in which each was the holder; provided, however, that Net Profit on Sale and Net Loss on Sale attributable to asset sales or other capital events shall be allocated in accordance with the Interests in the Company as held on the date of the asset sale or other capital event giving rise to such Net Profit on Sale or Net Loss on Sale.  Distributions shall be made to the holder of record of the LLC Interest on the date of distribution.

## ARTICLE 7.
## TRANSFER OF LIMITED LIABILITY COMPANY INTERESTS

7.1 Restrictions on Transfers of LLC Interest.  No Member shall, in any manner, convey, sell, transfer, pledge, bequeath, donate, assign, encumber or otherwise dispose of, whether voluntarily or involuntarily, including, but not limited to, pursuant to judicial order, legal process, execution, attachment or otherwise (each such transaction being referred to herein as a "Transfer") any LLC Interest which he now owns or hereafter acquires, except as expressly set forth in this Agreement.  Any attempted Transfer of any LLC Interest, or any interest or right therein, made in violation of this Agreement shall be null and void.  The transferee of such LLC Interest shall not be entitled to have such LLC Interest Transferred upon the books of the Company and no person shall be entitled to receive distributions thereon until such Transfer is rescinded.

7.2 Transfers to the Company.  A Member may Transfer all or any part of his LLC Interest to the Company.

7.3 Transfers to Members.  A Member may Transfer any portion of his LLC Interest (or any part thereof) at any time, either inter vivos or by will or intestacy, without the approval of the remaining Members to another Member; provided that such LLC Interest shall continue to be subject to all of the provisions of this Agreement.

7.5 Purchase Right of Company Upon Certain Events. In the event of (i) a Member's death or bankruptcy, or (ii) an involuntary Transfer of any LLC Interest which is or is held to be legally enforceable then, unless the business of the Company is not continued in accordance with Article 13 below, the Company and the Members shall have the right, but not the obligation, to repurchase such Member's LLC Interests at the

Appraised Value, in which event the Member, or estate of the deceased Member, or other transferee in such involuntary Transfer, as the case may be, shall sell the same to the Company or the Members, as the case may be. Otherwise, the Company shall be dissolved subject to the continuation rights set forth in such Article 13. Any election to repurchase shall be made by Members holding the Required Majority and shall be made within 90 days after (i) the applicable Member or other person's death or bankruptcy, or (ii) the receipt of notice by the Members of the involuntary Transfer. Any such repurchase by the remaining Members shall be made on a pro rata basis calculated based upon the total number of Units of LLC Interests held by each such Member, unless otherwise agreed by the Members. Closing on such repurchase shall occur within twelve (12) months from the date of such death or bankruptcy. If the Company is continued pursuant to Article 13 and the Company and the Members do not make the election to repurchase, the Member or, if and as applicable, his executor, administrator, guardian or other legal representative, or heirs immediately and without any affirmative action by any person shall be deemed to be the Member(s) and the holder(s) of the Member's LLC Interest in the Company. If the Company and the Members do not make the election to repurchase, the provisions of this Section 7.6 shall again apply in the event that there shall be a subsequent event which falls within the scope of this paragraph. For example, if the Company and the Members do not make an election under this paragraph to repurchase upon the retirement of a Member. The provisions of this paragraph also shall apply to any assignee or transferee of all or any portion of a Member's LLC Interest.

7.9 Termination Events Regarding Members. In the event of a Member's death or bankruptcy, then unless the Company is continued pursuant to Article 13 below, the Company shall be dissolved in accordance with such Article 13. If the Company is continued pursuant to Article 13, the Member or, if and as applicable, his executor, administrator, guardian or other personal representative, or heirs immediately and without any affirmative action by any person shall be deemed to be the assignee(s) of the Member, and therefore shall be deemed to be the holder(s) of the Member's LLC Interests in the Company.

7.10 Appraised Value. In the event that this Agreement requires that an "Appraised Value" be determined, the Manager shall notify the other Members of an intent to value LLC Interests by the appraisal procedure set forth below.

(a) The Affected Member (as defined below) and those Members other than the Affected Member (the "Remaining Members") may agree on the Appraised Value within twenty (20) days from the delivery of the notice of election to establish the Appraised Value. If the Appraised Value is not agreed upon by the Remaining Members and the Affected Member within twenty (20) days from the delivery of the notice of such election, the Appraised Value shall be determined by two appraisers, one to be selected by the Affected Member and one to be selected by the Remaining Members; provided, however, if the Remaining Members and the Affected Member so agree, the Appraised Value may be determined by one appraiser selected jointly by the Remaining Members

and the Affected Member. Each appraiser selected hereunder shall have performed at least two business appraisals for a state or federal court proceeding or a financial institution, within the last two years. Each such appraiser shall be disinterested, objective and without any business dealings with any of the Members prior to his appointment. The Company and each of the Members shall fully cooperate with each appraiser selected hereunder in order to permit each such appraiser to adequately perform his appraisal. The Appraised Value shall be the average of the valuations determined by such appraisers; provided, however, that (i) if the difference between the valuations is more than 50% of the lower valuation, then the Appraised Value shall be equal to the average of such valuations plus 10% of such average; (ii) if a party fails to select an appraiser within thirty (30) days from the date of receipt of the written request from the other party for appointment of his appraiser, or if an appraiser fails to submit his valuation to all Members and the Company within sixty (60) days from the date of his appointment, then the Appraised Value shall be the valuation of the other appraiser; and (iii) if the parties shall have selected only one appraiser, then the Appraised Value shall be the valuation of such appraiser. The expenses of any such appraisal shall be borne pro rata by the Affected Member and the Remaining Members, based upon the number of Units held by them immediately prior to the appraisal; provided, however, if the Remaining Members and the Affected Member so agree, the Company may bear all costs of the appraisals.

(b) As used in this Agreement, the term "Affected Member" means (i) the Defaulting Member, in the case of an appraisal pursuant to Section 5.7 above, or (ii) the bankrupt Member, the estate or personal representative of a deceased Member, or the transferee in an involuntary Transfer.

## ARTICLE 8.
## BOOKS AND RECORDS; REPORTS AND NOTICES

8.1 Books and Records. The Manager shall keep, or cause to be kept, full and accurate books and records of the Company. The books and records of the Company shall be kept at the principal office of the Company or at such other places as the Members shall from time to time determine.

8.2 Right of Inspection. Any Member of the Company shall have the right, upon written demand stating the purpose thereof, to examine for any proper purpose and during normal business hours, the books and records of account, minutes and records of Members and to make copies thereof. A proper purpose shall mean a purpose reasonably related to such person's interest as a Member. Such inspection may be made by any agent or attorney of the Member. Upon the written request of any Member of the Company, it shall mail to such Member its most recent financial statements, showing in reasonable detail its assets and liabilities and the results of its operations.

8.3 Financial Records. All financial records shall be maintained and reported based on generally accepted accounting principles.

## ARTICLE 9.
## DISTRIBUTION OF PROFITS

9.1 Distribution of Profits. Members holding the Required Majority may from time to time declare, and the Company may distribute, accumulated profits agreed by such Members to be not necessary for the cash needs of the Company's business. All such amounts shall be distributed in the following strict order of priority:

(a) First, return of the initial Capital Contributions and any subsequent Capital Contributions of the Members. If the amounts declared to be available for distribution are not sufficient to make distributions to all such Members in the full amount to which they are entitled, distributions shall be made to such Members pro rata in accordance with the respective full amounts to which such Members would be entitled; and

(b) Second, the balance to the Members pro rata in accordance with their Profit Percentages.

9.2 Tax Payment Distributions. As an exception to the cash-distribution priorities established under Section 9.1, the Members may make distributions to the Members from time to time to fund the payment of income-tax liabilities (if any) incurred by the Members with respect to taxable income of the Company. Any such distributions ("Tax Payment Distributions") shall be made to all Members pro rata in accordance with their Profit Percentages. Tax Payment Distributions shall be made only from accumulated profits agreed by the Members to be not necessary for the cash needs of the Company's business (including repayment of Company debt). The timing and amount of Tax Payment Distributions (if any) shall be within the sole discretion of the Members.

9.3 Repurchases: Notwithstanding the provisions of Section 9.1 above, the Company may repurchase all or any portion of a Member's LLC Interest and may utilize accumulated profits of the Company therefor.

## ARTICLE 10.
## OFFICERS

10.1 Manager. The Manager shall be the chief executive officer of the Company responsible for the general overall supervision of the business and affairs of the Company. The Manager may also have such other titles and hold such other offices as the Required Majority shall so designate (which titles may include, but not necessarily be limited to, president, chairman and/or chief operating officer). He shall, when present, preside at all meetings of the Members. The Manager may sign, on behalf of the Company, such deeds, mortgages, bonds, contracts or other instruments which have been appropriately authorized to be executed by the Members except when the

signing or execution thereof shall be expressly delegated by the Members, this Agreement or statute to some other Officer or agent of the Company; and, in general, the Manager shall perform all duties as may be prescribed by the Members from time to time. Unless the Members otherwise prescribe, the Manager may carry out any or all of his duties through other persons to whom he may delegate responsibilities. The specific authority and responsibility of the Manager shall also include the following:

(a) The Manager shall effectuate this Agreement and the regulations and decisions of the Members.

(b) The Manager shall direct and supervise the operations of the Company.

(c) The Manager, within such parameters as may be set by the Members, shall establish such charges for services and products of the Company as may be necessary to provide adequate income for the efficient operation of the Company.

(d) The Manager, within the budget established by the Members, shall set and adjust wages and rates of pay for all personnel of the Company and shall appoint, hire and dismiss all personnel and regulate their hours of work.

(e) The Manager shall keep the Members advised in all matters pertaining to the operation of the Company, services rendered, operating income and expense, financial position, and, to this end, shall prepare and submit a report to the Members at each regular meeting and at other times as may be directed by the Members.

10.2 Executive Officer. Gerald J. Mullaney, Jr. is hereby appointed to serve as Manager, President and Chief Executive Officer and to act in accordance with the provisions of Section 10.1 above. He shall hold office in accordance with the provisions of section 10.4 below.

10.3 Other Officers. The Company may, at the discretion of Members holding the Required Majority, have additional Officers including, without limitation, one or more Vice-Managers (who may also be vice-presidents), a Secretary and one or more Assistant Secretaries and a Treasurer and one or more Assistant Treasurers. Officers need not be selected from among the Members. One person may hold two or more offices, except one person may not hold both the office of Manager and the office of Secretary. When the incumbent of an office is (as determined by the incumbent himself or by the Members) unable to perform the duties of such office, or an office is vacant (both such situations referred to hereafter as the "absence" of the Officer), the duties of the office shall be performed by the person specified by the Members.

10.4 Election and Tenure. The Officers of the Company shall be elected annually by the Members at the annual meeting. Each Officer shall hold office from the date of his election until the next annual meeting and until his successor shall have been elected, unless he shall sooner resign or be removed.

10.5 Resignations and Removal. Any Officer may resign at any time by giving written notice to the Manager or to all of the Members, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Any Officer may be removed at any time by the Members with or without cause.

10.6 Vacancies. A vacancy in any office may be filled for the unexpired portion of the term by the Members.

10.7 Salaries. The salaries of the officers shall be fixed from time to time by the Members and no officer shall be prevented from receiving such salary by reason of the fact that he is also a Member of the Company.

## ARTICLE 11.
## MISCELLANEOUS

11.1 Notice. Any notice required or permitted to be given, pursuant to the provisions of the Statute or this Agreement, shall be effective as of the date personally delivered, or if sent by mail, on the date deposited with the United States Postal Service, prepaid and addressed to the intended receiver at his last known address as shown in the records of the Company.

11.2 Waiver of Notice. Whenever any notice is required to be given pursuant to the provisions of the Statute or this Agreement, a waiver thereof, in writing, signed by the persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

11.3 Indemnification By Company. To the fullest extent permitted by law, the Company shall indemnify and hold harmless any person who was or is a party defendant or is threatened to be made a party defendant to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigation (other than an action by or in the right of the Company) by reason of the fact that he is or was a Member of the Company, officer, employee or agent of the Company, or is or was serving at the request of the Company, against any and all losses, claims, damages, expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if the party to be indemnified acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo

contendere or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

11.4 Indemnification Funding.

(a) To the fullest extent permitted by law, expenses incurred by an indemnified party in defending any claim, demand, action, suit or proceeding subject to Section 11.3 shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon the receipt by the Company of an undertaking by or on behalf of the indemnified party to repay such amount unless it shall be determined that such person is entitled to be indemnified as authorized in Section 11.3.

(b) The indemnification of Section 11.3 shall be in addition to any other rights of an indemnified party under any agreement, pursuant to any vote of the Members, as a matter of law or otherwise, and shall continue as to an indemnified party who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and personal representatives of the indemnified party.

(c) Any indemnification under Section 11.3 shall be satisfied solely out of the assets of the Company. The Company may obtain insurance in order to satisfy its indemnification obligations, either in whole or in part. In no event may an indemnified party subject any Member to personal liability by reason of these indemnification provisions. An indemnified party shall not be denied indemnification under Section 11.3 because the indemnified party had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of this Agreement.

11.5 Anticipated Transactions. It is anticipated and acknowledged that the Members and Officers will have other legal and financial relationships in addition to their relationship with the Company. It is expressly understood and agreed that no Member shall be required by this Agreement to devote his entire time or attention to the business of the Company or shall be restricted by this Agreement in any way from participating in other businesses or activities. The provisions of this Section 11.5 shall not supersede any agreement between the Company and any Member contained in any employment agreement, consulting agreement, confidentiality agreement, distribution agreement, non-competition agreement or other agreement.

11.6 Further Assurances. Each of the parties agrees to take such further actions and execute and deliver such documents as may be reasonably necessary or appropriate to effectuate the terms of this Agreement.

11.7 Applicable Law. The validity, construction, interpretation, and effect of this Agreement shall be governed by Pennsylvania law, without regard to principles of choice of laws.

11.8 Construction. The paragraph headings of this Agreement are for convenience of reference only and do not form a part of the terms, conditions, or covenants of this Agreement or give full notice thereof. As used in the Agreement, the masculine includes the feminine, and the single includes the plural.

11.9 Benefit. This Agreement shall be binding on, and inure to the benefit of, the parties hereto and their respective heirs, executors, administrators, successors, and permitted assigns.

11.10 Entire Agreement. This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof, no other representations or covenants having induced any party to enter into this Agreement.

11.11 Severability. If any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other document.

11.12 Definitions. As used herein, the following terms shall have the following meanings:

(a) The term "person" shall include any individual, corporation, partnership, association, trust, joint stock company or unincorporated organization;

(b) The term "bankruptcy" of a person shall be deemed to have occurred upon the happening of any of the following:  (i) the filing of an application by such person for, or a consent to, the appointment of a trustee of its or his assets; (ii) the filing by such person of a voluntary petition in bankruptcy or the seeking of relief under Title 11 of the United States Code, as now constituted or hereafter amended, or the filing of a pleading in any court of record admitting in writing its or his inability to pay its or his debts as they come due; (iii) the making by such person of a general assignment for the benefit of creditors; (iv) the filing by such person of an answer admitting the material allegations of, or its or his consenting to, or defaulting in answering, a bankruptcy petition seeking relief under Title 11 of the United States Code, as now constituted or as hereafter amended; or (v) the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such person a bankruptcy or for relief in respect of such person or appointing a trustee of its or his assets, and such order, judgment or decree continue unstayed and in effect for any period of 60 consecutive days.

11.13 Counterparts. This Agreement may be executed in counterparts which when taken together shall constitute one agreement binding on all the parties notwithstanding that all the parties are not signatories to the same counterpart.

## ARTICLE 12.
## AMENDMENTS

12.1 Amendments. This Agreement may be altered, amended, restated, or repealed and a new Agreement may be adopted, at any time or from time to time, by Members holding a Required Majority.

## ARTICLE 13.
## DISSOLUTION

13.1 Events Causing Dissolution. As required under the Statute, the Members agree that the Company shall be dissolved upon the:

(a) written consent of all Members;

(b) upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member;

(c) the occurrence of any other event which terminates the continued membership of a Member in the Company; provided, however, the parties agree that, upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which terminates the continued membership of a Member, the Company shall have the right to continue its business if within ninety (90) days following the dissolution event, all of the Members shall have consented to continue the business of the Company.

13.2 Liquidation. Upon the termination and dissolution of the Company, the Manager or, if there is no Manager, any person elected to perform such liquidation by the written consent of the Members shall proceed with the liquidation of the Company, and the proceeds of such liquidation shall be applied and distributed in the following order of priority:

(a) First, to the Members pro rata in accordance with their positive Capital Account balances, to the extent of such balances; and

(b) Second, to all Members pro rata in accordance with their relative Profit Percentages.

13.3 Distributions in Kind.   In the event it becomes necessary to make a distribution of Company property in kind, such property shall be transferred and conveyed to the Members or their assignees so as to vest in each of them an interest in the whole of said property equal to their interests in the distribution of proceeds in accordance with Article 9 hereof.  Any valuation of Company property shall be made by a firm of certified public accountants, appraisers or investment bankers selected by the Manager in its sole discretion.

**THE UNDERSIGNED,** being all of the Members of Hopwood Farm, LLC, a Pennsylvania Limited Liability Company, have duly executed this Agreement on the day and year first written above.

Gerald J. Mullaney, Jr.

Martin P. Mullaney

Paul F. Newlin

David C. Marchese

McCauley Associates Partnership

By:

Title:

## SCHEDULE A

| Name | Capital Contribution | Profit Percentage |
|------|----------------------|-------------------|
| Gerald J. Mullaney, Jr. | $ | 12 ½% |
| Martin P. Mullaney | $ | 12 ½ % |
| Paul F. Newlin | $ | 12 ½ % |
| David C. Marchese | $ | 50% |
| McCaulty Assocs. | $ | 12 ½% |

## EXHIBIT A

### JOINDER IN
### HOPWOOD FARM, LLC
### LIMITED LIABILITY COMPANY AGREEMENT

In consideration of the issuance to (him) (her) of _____ units of
_____ Limited Liability Company Interests of _____ (the
"Company"), _____ ("Additional Member"), and the Company agree that,
as of the date written below, Additional Member shall become a party as a Member to
the Company's Limited Liability Company Agreement dated as _____
(the "Agreement").  Additional Member agrees to be bound by all of the terms and
provisions of the Agreement, as though he was an original party thereto and was
included in the definition of "Member" as used therein.

Executed as of the _____ day of _____, 20__

HOPWOOD FARM, LLC

By: _____

_____
Additional Member

## EXHIBIT B

## VALUATION SCHEDULE

Valuation of LLC Interest made in conformity with and pursuant to an Agreement dated as of _____, by and among _____, _____ and _____.

Valuation of Voting LLC Interest

| Date | Valuation | Signatures |
|------|-----------|------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Valuation of Non-Voting LLC Interest

| Date | Valuation | Signatures |
|------|-----------|------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |

## EXHIBIT C

Tax Allocations

1. DEFINED TERMS.  Capitalized terms used in this Exhibit B and not previously defined have the meanings given to them in paragraph 5 of this Exhibit B.

2. GENERAL TAX-ITEM ALLOCATION RULES.
(a) Net Profit and Net Profit on Sale. Except as otherwise provided herein, Net Profit and Net Profit on Sale for any taxable year or other applicable period shall be allocated as follows:
(1) First, until the cumulative Net Profit and Net Profit on Sale allocated pursuant to this subparagraph for the current and all prior periods equals the cumulative Net Loss and Net Loss From Sale allocated pursuant to subparagraph (b) hereof for all prior periods, to the Members in the reverse order that such Net Loss and Net Loss from Sale was allocated to the Members pursuant to subparagraph (b) hereof.
(2) Second, until the cumulative Net Profit and Net Profit on Sale allocated pursuant to this subparagraph for the current period and all prior periods equals the cumulative cash distributions previously made to all Members by the Company, to the Members so that (i) the proportions in which the cumulative Net Profit and Net Profit on Sale for the current period and all prior periods are allocated among the Members are as close as possible to (ii) the proportions in which the cumulative cash distributions previously made by the Company have been allocated among the Members.
(3) The balance of the Net Profit (if any) and the balance of the Net Profit on Sale (if any) shall be allocated to the Members pro rata in accordance with their relative Profit Percentages.
(b) Net Loss and Net Loss on Sale. Except as otherwise provided herein, Net Loss and Net Loss on Sale for each taxable year or other applicable period shall be allocated as follows:
(1) To those Members who have positive Capital Account balances, pro rata in accordance with their relative positive Capital Account balances, to the extent of such balances. Provided, however, that to the extent any Net Loss on Sale allocated to Member would cause such Member to have an Adjusted Capital Account Deficit as of the end of the fiscal year to which such Net Loss or Net Loss on Sale relates, such Net Loss or Net Loss on Sale shall instead be allocated to the Members pro rata in accordance with their relative positive Capital Account balances, to the extent of such balances.
(2) Any Net Loss and Net Loss on Sale in excess of the Members' aggregate Capital Account balances shall be allocated among all Members pro rata in accordance with their relative Profit Percentages.

3. SPECIAL ALLOCATIONS.

Notwithstanding any provisions of paragraph 2 of this Exhibit B, the following special allocations shall be made in the following order:

(a) Minimum Gain Chargeback (Nonrecourse Liabilities). If there is a net decrease in Company Minimum Gain for any Company fiscal year (except as a result of conversion or refinancing of Company indebtedness, certain capital contributions, or revaluation of the Company property, as further outlined in Treasury Regulation Sections 1.704-2(d)(4), (f)(2) or (f)(3)), each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to that Member's share of the net decrease in Company Minimum Gain. The items to be so allocated shall be determined in accordance with Treasury Regulation Section 1.704-2(f). This paragraph (a) is intended to comply with the minimum gain chargeback requirement in such regulation and shall be interpreted consistently therewith.

(b) Minimum Gain Attributable to Member Nonrecourse Debt. If there is a net decrease in Minimum Gain Attributable to Member Nonrecourse Debt during any fiscal year (other than due to the conversion, refinancing or other change in the debt instrument causing it to become partially or wholly nonrecourse, certain capital contributions, or certain revaluations of Company property (as further outlined in Treasury Regulation Section 1.704-2(i)(4)), each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to the Member's share of the net decrease in the minimum gain attributable to member nonrecourse debt. The items to be so allocated shall be determined in accordance with Treasury Regulation Section 1.704-2(i)(4) and (j)(2). This paragraph (b) is intended to comply with the minimum gain chargeback requirement with respect to Member Nonrecourse Debt contained in such regulations and shall be interpreted consistently therewith.

(c) Qualified Income Offset. In the event a Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6), and such Member has an adjusted capital account deficit, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate the adjusted capital account deficit as quickly as possible. This paragraph (c) is intended to constitute a "qualified income offset" under Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d) Member Nonrecourse Deductions. Member nonrecourse deductions for any taxable year or other applicable period shall be specially allocated to the Member that bears the economic risk of loss for the debt (i.e., the Member Nonrecourse Debt) in respect of which such member nonrecourse deductions are attributable, as determined under Treasury Regulations Section 1.704-2(b)(4) and (i)(1).

(e) Curative Allocations. The allocations provided under this paragraph 3 of Exhibit B (the "Regulatory Allocations") shall be taken into account in allocating other items of income, gain, loss, and deduction among the Members so that, to the extent possible, the cumulative net amount of allocations of

Company items under paragraphs 2 and 3 of this Exhibit B shall be equal to the net amount that would have been allocated to each Member if the Regulatory Allocations had not occurred. This subparagraph (e) is intended to minimize to the extent possible and to the extent necessary any economic distortions which may result from application of the Regulatory Allocations and shall be interpreted in a manner consistent therewith.

4. OTHER ALLOCATION RULES.

(a) Sections 1245/1250 Recapture. If any portion of gain from the sale of property is treated as ordinary income under Code Sections 1245 or 1250 ("Affected Gain"), then such Affected Gain shall be allocated among the Members in the same proportion that the depreciation and amortization deductions giving rise to the Affected Gain were allocated, and other Tax Items of gain of the same character that would have been recognized but for the application of Code Sections 1245 or 1250 shall be allocated away from those Members who are allocated Affected Gain so that (to the extent possible) the other Members are allocated the same amount, and type, of capital gain that would have been allocated to them had Code Sections 1245 or 1250 not applied. For purposes of the prior sentence, each Member shall be treated as having been allocated depreciation and amortization in the same proportion as such Member has been allocated any deductions giving rise to the Affected Gain.

(b) Allocations Respecting Section 704(c) and Revaluations. Tax Items with respect to Company property that is subject to Code Section 704(c) and/or Treasury Regulation Section 1.704-1(b)(2)(iv)(f) shall be allocated in accordance with said Code Section and Treasury Regulation Section 1.704-3.

(c) Excess Nonrecourse Liabilities. The "excess nonrecourse liabilities" of the Company (within the meaning of Treasury Regulation Section 1.752-3(a)(3)) shall be allocated among the Members pro rata in accordance with their Profit Percentages.

(d) Tax Credits. Tax credits shall be allocated among the Members in the same proportion as the expenditures (whether deductible or not) giving rise to such credits are allocated among the Members in determining allocations of Net Profit and Net Loss.

5. DEFINITIONS.

(a) "Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of any relevant taxable year and after giving effect to the following adjustments:

(1) Crediting to such Capital Account any amounts which such Member is obligated or treated as obligated to restore with respect to any deficit balance in such Capital Account pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c), or is deemed to be obligated to restore with respect to any deficit balance pursuant to the penultimate sentences of Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(2) Debiting to such Capital Account the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the requirements of the alternate test for economic effect contained in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(b) "Capital" shall mean, with respect to any Member, the initial Gross Asset Value of any Contributed Property (net of liabilities assumed by the Company in connection with such Contributed Property or to which such property is subject) and the amount of money contributed to the Company with respect to the Interest held by such Member (or deemed contributed to the Company on the termination and reconstitution thereof pursuant to Code Section 708).

(c) "Capital Account" shall mean, with respect to any Member, the separate "book" account which the Company shall establish and maintain for such Member in accordance with Code Section 704(b) and Treasury Regulation Section 1.704-1(b)(2)(iv) and such other provisions of Treasury Regulation Section 1.704-1(b) that must be complied with in order for the Capital Accounts to be determined in accordance with the provisions of said Treasury Regulations. In furtherance of the foregoing, the Capital Accounts shall be maintained in compliance with Treasury Regulation Section 1.704-1(b)(2)(iv), and the provisions hereof shall be interpreted and applied in a manner consistent therewith. In the event that an Interest is transferred in accordance with the terms of this Agreement, the Capital Account of the transferor attributable to the transferred Interest at the time of the transfer shall carry over to the transferee.

(d) Company Minimum Gain shall have the meaning set forth in Treasury Regulation Section 1.704-2(b)((2) for "partnership minimum gain."

(e) "Contributed Property" shall mean each property or other asset (excluding cash) contributed to the Company with respect to the Interest held by each Member (or deemed contributed to the Company on the termination and reconstitution thereof pursuant to Code Section 708).

(f) "Depreciation" shall mean, with respect to any asset of the Company for any taxable year or other period, the depreciation or amortization allowed or allowable for federal income tax purposes in respect of such asset for such taxable year or other period; provided, however, that if there is a difference between the Gross Asset Value and the adjusted tax basis of such asset, Depreciation shall mean "book" depreciation or amortization as determined under Treasury Regulation Section 1.704-1(b)(2)(iv)(g)(3).

(g) "Gross Asset Value" shall mean, with respect to any asset of the Company, such asset's adjusted basis for federal income tax purposes, except as follows:

(1) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset at the time of its contribution as reasonably determined by the Voting Members.

(2) If the Voting Members reasonably determine that an adjustment is necessary or appropriate to reflect the relative economic interests of the Members, the Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Voting Members, as of the following times:

    (A) immediately prior to a contribution to Capital (other than a de minimis Capital contribution) to the Company by a new or existing Member as consideration for an Interest;

    (B) immediately prior to the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for the redemption of an Interest; and

    (C) immediately prior to the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g).

(3) The Gross Asset Values of Company assets distributed to any Member shall be the gross fair market values of such assets as reasonably determined by the Voting Members as of the date of distribution.

(4) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Sections 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)((2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this paragraph to the extent that the Voting Members reasonably determine that an adjustment pursuant to paragraph (ii) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (iv).

Gross Asset Values shall be adjusted at all times by any Depreciation taken into account with respect to the Company's assets for purposes of computing Net Profit and Net Loss. Any adjustment to the Gross Asset Values of Company property shall require an adjustment to the Members' Capital Accounts.

    (h) "Member Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulation Section 1.704-2(i)(2) for "partner nonrecourse deductions."

    (i) "Minimum Gain Attributable to Member Nonrecourse Debt" shall mean "partner nonrecourse debt minimum gain" as determined in accordance with Treasury Regulation Section 1.704-2(i)(2).

    (j) "Net Profit or Net Loss" shall mean, for each taxable year or other applicable period, an amount equal to the Company's net profit or loss for such year or period as determined for federal income tax purposes in accordance with Code Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a) shall be included in taxable income or loss), with the following adjustments:

(1) Including as an item of gross income any tax-exempt income received by the Company;

(2) Treating as a deductible expense any expenditure of the Company described in Section 705(a)(2)(B), including amounts paid or incurred to organize the Company (unless an election is made pursuant to Code Section 709(b)) or any expenditure to promote the sale of interests in the Company, and treating deductions for any losses incurred in connection with the sale or exchange of Company property disallowed pursuant to Code Sections 267(a)(1) or 707(b) as expenditures described in Code Section 705(a)(2)(B);

(3) Taking into account Depreciation in lieu of depreciation, depletion, amortization, and other cost recovery deductions taken into account in computing total profit or loss;

(4) Excluding the gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes; and

(5) In the event of an adjustment of the Gross Asset Value of any Company asset which requires that the Capital Accounts of the Company be adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(e), (f), and (m), the amount of such adjustment is to be taken into account as Net Profit on Sale or Net Loss on Sale pursuant to this Exhibit B.

Once an item of income, gain, loss or deductions has been included in the initial computation of Net Profit or Net Loss or is subjected to the special allocation rules in this Exhibit B, Net Profit or Net Loss shall be recomputed without regard to such item.

(k) "Net Profit on Sale or Net Loss on Sale" shall mean the gain or loss resulting from the disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes, after deduction of any costs and expenses incurred by the Company in connection with such disposition, and computed by reference to the Gross Asset Value of such property rather than its adjusted basis.

(l) "Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulation Sections 1.704-2(b)(1) and (c).

(m) "Nonrecourse Liabilities" shall have the meaning set forth in Treasury Regulation Section 1.704-2(b)(3).